# CHARLESTON.

## STATE *v*. JOHN SAULS.

Submitted February 27, 1923.      Decided March 6, 1923.

1. HOMICIDE—*Objection to Evidence That Deceased Had Large Roll of Money Short Time Before Homicide, as too Uncertain as to Amount, Where Motive Robbery, Held Properly Overruled.*

   Where on the trial of one accused of murder the theory of the State is that the motive for the alleged crime was robbery of the deceased, and in support of that theory the State introduced a witness who testified that he had seen the deceased a short time before the homicide at his store or place of business with a large roll of bank bills, the objection of the defendant thereto on the ground that such evidence was too indefinite and uncertain as to the amount of money and tended to mislead the jury, was properly overruled. (p. 280).

2.  SAME—*Statements Made Causa Mortis Held Admissible as Dying Declaration.*

If, at the time, one is conscious of his condition and is told by his attending physician that he has but a short time to live, and he himself is weak and in great pain as the result of a mortal wound inflicted by defendant and declares that he is going to die and calls for his wife, and says to the physician that he wants to make a statement and does so, and shortly afterwards expires, a prima facie case is thus made for the admission of such dying declaration in evidence on the trial of the one accused of his murder. (p. 282).

3.  SAME—*Evidence That Deceased Had Family Held Admissible.*

On the trial of one accused of murder, evidence that deceased had a family would ordinarily have no bearing on the question of defendant's guilt or innocence of the crime, and should not be admitted; but where the defense is self defense and that defendant was lead to the killing by the sudden provocation of seeing his wife and deceased in the act of adultery, such evidence may have some slight bearing on the question of fact whether one with a family was likely to engage in such immoral conduct. (p. 284).

4.  WITNESSES—*Proper to Cross-Examine Accused as to Giving Deceased Liquor, Where Imputation That Deceased Provided it to Aid His Immoral Conduct With Wife of Accused.*

Where on his examination in chief the defendant testified that deceased had brought liquor to his home, from which both drank before the homicide, it was competent for the State to inquire of him on cross examination whether he had not himself provided the liquor and given it to the deceased to drink, when the imputation was that deceased had provided the liquor for the purpose of aiding him in his subsequent immoral conduct with defendant's wife. (p. 285).

5.  HOMICIDE—*Where Robbery Alleged Motive, Error to Exclude Testimony That Deceased Deposited Money Alleged Taken Before Homicide.*

Where on the State's theory of robbery it is permitted to show that shortly before the homicide deceased had money on his person in a considerable amount, which was not found on him immediately after the homicide, it constitutes reversible error for the trial court to reject evidence offered by defendant showing or tending to show that deceased on

the evening of the same day had deposited in bank to his credit a considerable amount of currency and checks, thereby to account for the absence of the money from his person after the homicide. (p. 285).

MCGINNIS, JUDGE, *absent.*

Error to Circuit Court, Raleigh County.

John Sauls was convicted of murder in the second degree, and he brings error.

*Reversed and remanded.*

*H. A. Dunn, A. P. Farley, C. L. Lilly* and *T. J. McGinnis,* for plaintiff in error.

*E. T. England,* Attorney General and *R. A. Blessing,* Assistant Attorney General for the State.

MILLER, *President*:

Upon an indictment charging him with the murder of E. F. Jones, in Raleigh County, the defendant was twice found guilty of murder in the second degree. In the first instance, the court, on motion of the defendant, set aside the verdict and awarded him a new trial. In the last instance, however, the court refused to disturb the verdict of the jury; and, on April 3, 1922, entered the judgment complained of, that defendant be imprisoned in the state penitentiary for a period of five years.

In defendant's petition for the present writ his counsel have assigned numerous grounds of error, but in their brief and argument here only a few of them are relied on. We have examined them all, but will now confine ourselves to those relied on, as they are the only ones which seem to us to deserve serious consideration.

There is no controversy in the evidence as to the fact of the killing by defendant; and there is but little, if any, conflict in the evidence as to the immediate circumstances of the homicide. It occurred on the evening or night of November 12, 1921, in a barn, or shed attached thereto, located on the rear end of the lot on which the dwelling occupied by the

defendant and his wife and two infant children was located, in the city of Beckley, Raleigh County, between eight and nine o'clock.

On the trial, the State had one theory, the defendant another, for the commission of the crime. The theory of the State was that the motive of the defendant, and of his wife for the part she played in the tragedy, was to rob the deceased. The defendant's theory was that the deceased had come to his home for the purpose of robbing him, not of his money, but of the virtue of his wife, between whom and deceased there had been rumors, at least, of improper relations, but not known to him. The facts on which the witnesses agree are that the deceased came to the home of the defendant on the night of the killing between seven and eight o'clock, and after remaining there a short time defendant left his house and went to the barn or shed where shortly afterwards the homicide took place. Defendant says he had started to town, on his wife's representation that Judge McGinnis, a lawyer in charge of some litigation for him, wanted to see him, and being pressed by nature, that he went by way of the barn where there was a closet or toilet, to answer that call; that he had been there but a few minutes when the deceased entered the door and stood in the doorway, apparently arranging his clothes or person and looking back towards the house; that his wife then appeared and entered the same door, and was embraced and kissed by deceased, who began to pull up her clothes in the act of sexual intercourse, when defendant called to him and inquired: "What the hell does this mean!" and being first shot at by deceased, he then fired three shots, two of which took effect, one in the arm of deceased, the other in his left side, over the seventh rib in the posterior axiliary line, as described by the attending surgeon. Defendant's contention was that he had inflicted these wounds, one of which proved fatal, in the heat of blood, and under the great provocation which then confronted him, and also in self defense, it being shown that deceased was also armed; and defendant and his wife both testify that deceased fired the first shot.

Defendant's wife testified that deceased had come to her home pursuant to a previous appointment between her and him by notes exchanged the day before and on the same day, and that she followed him to the barn after her husband had left the house, pursuant to that appointment, not knowing that her husband had gone to the barn; and she corroborates him as to what occurred before and when they met on the scene of the tragedy.

The State undertook to sustain its theory of robbery, first, by the dying declaration of the deceased, second, by evidence that deceased was called to come to defendant's home, as one of the witnesses says by his wife, another says by defendant himself; that defendant represented he wanted to pay his grocery bill, and that the deceased went there to collect the bill; that on the afternoon or the evening before the homicide defendant had been seen in the store and warehouse of deceased talking to him and probably paying him some money which he had collected for him; that just before leaving his store, a clerk of the deceased swore, he had seen deceased with a large pocketbook, and one witness said he had seen him with a large roll of bank bills, and another of the State's witnesses, a truck driver of the deceased, swore that the deceased left the store with him on the truck on the way to defendant's house, and that he alighted at a street corner not far from there, and that between the time they left the store on the truck and the time deceased left him, the latter did not handle his pocketbook or exhibit any roll of bills; and it was shown by the police officer who visited the scene of the tragedy and arrested defendant that deceased did not have on his person when found at the barn and afterwards removed to a hospital, any pocketbook or any money except a small amount of change. This evidence of the State relating to the pocketbook was excluded by the court, but the evidence relating to the roll of bills and the dying declaration of the deceased were allowed to remain in the record, to support the State's theory of robbery as the motive for the homicide.

The first of the alleged errors relied on for reversal is the admission, over objection, of the evidence of the witness Hern,

a customer, that he had seen deceased have a roll of green-
backs, which he judged was as large as his arm. It is said of
this testimony that it was very indefinite as to the amount of
money, for if the bills were one dollar bills, it might have
amounted to very little money, whereas if the bills were large
ones, the sum would have been greater, and that therefore the
testimony was misleading. We do not think the jury could
have been misled by the supposed indefinite character of the
testimony. They were competent to take into consideration
the character of the evidence and to give it such, and only
such, weight as it was entitled to. The money, if it had ex-
isted in fact, was gone, somewhere. No witness was produced
or perhaps able to say where, but the evidence tended, in
some degree at least, to support the theory of the State, that
shortly before the deceased left his store he had some money
on his person, which was not accounted for, by the evidence
of the State at least. And as to the evidence of the witness
Joines, deceased's clerk, it tends to show that before deceased
left his store he had some money on his person paid him by
customers that day; and that if he had, he left the store that
evening with the money on his person. The criticism is that
the witness should have related the circumstances which led
him to believe that Jones had the money when he left the
store, and not merely given his own conclusion as to the fact,
the fact being one for the jury. We think the witness did
relate all the facts and circumstances which were likely with-
in his knowledge; besides, he was subject to cross examination
by defendant's counsel, and was fully cross examined. His
evidence, we think, was admissible on the State's theory; its
weight of course was for the jury to determine.

A point of special attack on this testimony relating to
money on the person of the deceased and his pocketbook, is
that there is no evidence showing that the defendant had any
knowledge that deceased had a pocketbook or of its contents,
or that he had the roll of money or any money on his person
on the evening before the tragedy, to show or constitute any
basis for the State's theory of robbery, and that this fact
taken in connection with the testimony of the officers who

arrested and searched defendant, that he had no pocketbook or
any money on him, showed that defendant may have been
unduly prejudiced by the admission of the evidence relating
to the subject of money on the person of the deceased. The
court struck out the evidence relating to the pocketbook. As
to the other testimony, we think that the fact that the defend-
ant was a collector for deceased and had been with him on
the afternoon of the day of the tragedy and acknowledged
having paid him some money, and was with him in the ware-
room privately, was some slight evidence that he may have
had some knowledge that the deceased then had money, and
would probably have money on his person on a Saturday
night. Such evidence was proper to go to the jury on the
State's theory, and however weak it may have been to estab-
lish the fact of defendant's knowledge, the jury were compe-
tent to judge of that. It was some evidence bearing on that
theory, which we think the court was justified in admitting.
This conclusion is also applicable to the testimony of the wit-
ness Wagoner, the truck driver, to the effect that between the
time Hern left the store and the time he and Jones left, if
Jones placed the money anywhere the witness would have
known it.

The next two assignments of error relate to the admission
of the dying declaration of the deceased. Two witnesses tes-
tified to this declaration; one the witness Williams, present
when the declaration was made, and the other the attending
surgeon who waited on the deceased at the hospital. It is
said of this declaration that the proper foundation was not
laid for its admission. This declaration, the evidence shows,
was made after the deceased was taken to the hospital and
was in great pain, and after he had inquired and had been
told by the surgeon that his case was a desperate one, and
advised that if he had anything to say he had better improve
the time at once. The witness Williams swore that Dr. Wris-
ton told Jones that he had only a short time to live, and that
if he had any statement to make or anything he wanted to
fix up, he had better do so, and that Jones said he wanted to
make a statement, and that he then said: "A woman

called me over the 'phone;" that he .didn't call her name; that he stopped and repeated the question again to Dr. Wriston, asked him what he thought of his condition; then he started out again and said: "I went up to Mr. Sauls' house, and Mr. Sauls was there when I got there. Shortly after I got there Mr. Sauls said he had to go up town;" and he said that in a short time after Mr. Sauls had stepped out, Mrs. Sauls told him to go to the barn and she would meet him up there, and he said: "I went. And when I got there Mrs. Sauls came, and she came up to me and put her arms around me, and about that time Mr. Sauls stepped out and says: 'What in hell does this mean? Throw up your hands!' And I did, and he shot me." Dr. Wriston's evidence was that he had been in deceased's room several times that night; that while there Jones called for him to come in there, and told him that he was going to die and to send for his wife; that his condition was then bad; that it was but two or three minutes after Jones told him he was going to die, and while he was still looking at him, that he said: "A woman was the cause of this." Witness replied: "How is that?" And Jones answered: "Sauls told me to come over and he would pay his grocery bill. I went over there and he said he would have to go to town to get the money. He left the house." He referred to the woman as "she"; he didn't call her name. "She asked me to meet her at the barn. I went to the barn, and instead of him a'going to town, he went to the barn, and when I walked in he told me to throw up my hands, and I did, and he shot me." It was the opinion of Dr. Wriston that Jones understood he was going to die, and that he was in his right mind and understood what he was saying; and he did in fact die that night. There is really nothing in this statement of the deceased in conflict with the testimony of the other witnesses. The declaration does not include anything about the shot fired by the deceased at the defendant, nor how many shots were fired by him; it is very brief and guarded as to the other details of the homicide; and it bears to some extent on the State's theory that Jones was inveigled by defendant and his wife

into a trap set for him at the barn for the purpose of robbery. The only serious question raised by defendant's counsel is as to whether the proper foundation was laid for the admission of the declaration as a dying declaration. We have said: "If the condition of the declarant at the time of making his dying declaration, the nature of his wounds, the length of time after making the same before expiring, and all the circumstances make a *prima facie* case that he was then in the article of death, and conscious of his condition when he made it, such evidence should be admitted by the court, as making a *prima facie* case for the admission of such dying declaration." State v. Clark, 64 W. Va. 625, and cases cited. We can not doubt, nor do we think the trial court should have doubted from the evidence, that the deceased knew and appreciated that death was impending. The doctor had told him his time was short; and he seems to have taken time to deliberate on the question; and it was only after he had repeated his question to the doctor as to what he thought of his condition and got the doctor's answer that he told him that he was going to die, requested him to send for his wife, and made his statement, which was admitted in evidence. We can not say the court erred therein; and this is sufficient for us to deny a new trial on that ground. The case, we think, is brought not only within the rules of our own case cited, but also within the rule of *Swisher* v. *Commonwealth*, 26 Gratt. 964, one of the cases cited and relied on in the Clark case.

Another point urged for reversal is that Mrs. Jones, wife of the deceased, was allowed to testify that they had a family. The whole of her evidence on this subject is: "Q. How old was your husband at the time he was killed? A. He was on—thirty-eight. Q. How long had you been married? A. About 19 year. Q. What? A. About 19 year. Q. A family? A. Yes, sir." When these questions were propounded and answered there was no objection, but at the conclusion defendant's counsel moved the court to strike out all of the witness's evidence except that fact that she saw her husband after he was dead, which motion was denied.

Of course the fact that deceased and the witness had a family had no direct bearing on the guilt of the accused, except perhaps that a man with a family would not likely be engaged in an effort to debauch defendant's wife and ruin his home, according to defendant's theory, justifying or excusing him for his killing. We doubt whether the evidence, according to the strict rule, should have been received, but under the circumstances, we have no idea that the verdict of the jury was influenced thereby, and it is quite too technical a question on which to base a reversal.

Another point of error relied on is that defendant on cross-examination was required to answer the following questions: "As a matter of fact don't you know that that is liquor that you brought from Sand Lick? And had there yourself; and didn't you ask Harvey Templeton to go over to Sand Lick to bring some liquor for you on that day?" The language of the objection embraces two questions propounded to the witness. The first was not answered; the second was answered in the negative: "I did not." The witness had sworn in chief and repeated on cross examination that the deceased had brought with him two pints of liquor from which both had drunk before he left the house. The purpose was to show if possible that defendant had provided the liquor himself. But as he denied it, there was nothing left to complain about, except the possible implication by the question that the defendant was a "bootlegger," and if not guilty of murder was guilty of another crime for which he should be punished; and this is cited in criticism of the ruling of the court. We think the question was proper cross examination; and, besides, as it was answered in the negative, it did not likely materially influence the jury one way or another.

The last point of error urged is the serious one in the case, and the one on which we are obliged, we think, to reverse the judgment and award the defendant a new trial. As an offset to the State's theory of robbery, and the admission of the dying declaration of deceased, and the evidence of the other witnesses admitted on that theory, the defendant offered

to show that if deceased had any money on his person in the afternoon or evening before he left the store to go to the defendant's house, he must have deposited it in bank; and to show this M. J. Meadows, assistant cashier of the Raleigh County Bank, if his evidence had been admitted, would have testified in substance, that his bank kept open on Saturday nights, and was open on the night of November 12, 1921; that the records of the bank, and particularly a deposit slip on file, showed a deposit by deceased as of November 14, 1921, two days after the homicide, and could be accounted for only on the theory that it was made by defendant on Saturday evening, the custom of the bank being to carry all such business into the business of the succeeding Monday. This deposit slip showed deposits as follows: Currency $50.00; checks as follows: $7.00, $30.00, $7.00, $97.35, $30.39, $1.95, $1.50, $2.25, $2.50, $1.45, $1.08, $3.00, $1.30, $1.00, $20.00; Total $257.77. An effort was also made to show by the witness Joines, deceased's clerk, and also by A. P. Farley, that the deposit slip was in the handwriting of the deceased, and that the deposit was not made by Joines on Monday; but the court would not admit the evidence on this subject.

As the State had been permitted to introduce the evidence of the possession of money by the deceased before he left the store and the absence of any considerable amount of money on his person after he was found at the place of the homicide, it was, we think, very material on the State's theory of robbery for the defendant to attempt to account for its absence from the deceased's person after the killing, by showing that he had deposited the money in question. It was certainly competent to rebut the State's theory that the deceased had been robbed by defendant, or that his purpose in the killing was robbery.

Our conclusion is that the judgment should be reversed, the verdict set aside, and the defendant awarded a new trial.

*Reversed and remanded.*