419 S.E.2d 447

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Gary WHEELER, Defendant Below, Appellant.**

No. 20286.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 21, 1992.

Decided May 28, 1992.

Kristen L. Keller, Deputy Pros. Atty., Beckley, for appellee.

C. Cooper Fulton, Kanawha County Public Defender, Charleston, for appellant.

BROTHERTON, Justice:

The appellant, Gary Wheeler, was convicted of malicious wounding, two counts of attempted murder, and first-degree murder as a result of incidents which took place between 2:00 a.m. and 3:00 a.m. on February 21, 1990, in the parking lot of a Super 8 Motel in Beckley, West Virginia. Wheeler turned himself in to police later that day. A jury trial was held from August 13–15, 1990, and Wheeler subsequently received sentences of life without mercy and four-to-twenty years in the State penitentiary. He now appeals his conviction.

In order to facilitate our discussion of the issues raised on appeal, we will briefly recount the events leading up to the shootings. It is apparent from the record that the parties in this case were involved in several encounters in the late night and early morning hours of February 20 and 21, 1990. The appellant, Gary Wheeler, spent the evening drinking at various bars in Raleigh County with Richard Spencer and Gerald Day. According to the appellant, both Spencer and Day were drunk.

That same night, Kevin Prunty, Gary Fluharty, and Eugene Chipps were drinking at Eden's Lounge in the Holiday Inn in Beckley. All three men were truck drivers who were working for a Harrisville, West Virginia, company. Evidence presented at trial indicated that Kevin Prunty was very drunk. At closing time, Wheeler, Spencer, and Day were in the parking lot making arrangements to meet three women at another club. Eugene Chipps was also talking with one of these women and obtained her phone number. Either Wheeler or someone in his group yelled a derogatory remark out the car window as they were leaving, and Fluharty, Prunty, and Chipps began chasing the car on foot.

A confrontation followed when the car stopped at a red light. Fluharty slapped the car with his hand and asked whether there was a problem. Wheeler put the car in reverse and then backed up, knocking Prunty down. Wheeler then proceeded through the intersection, and the truckers watched as the car pulled into the nearby Check Mark Club. According to Chipps, he, Fluharty, and Prunty "decided to go see what the problem really was." Kevin Prunty was furious about being hit by the car, and he got a tire iron out of his truck. The three men then got into Fluharty's truck and drove to the Check Mark Club, which was closed. Kevin Prunty ran toward the car being driven by Wheeler and hit the hood and the passenger side of the vehicle with the tire iron. The three women arrived at about this time, but were apparently frightened and went back to Eden's Lounge. Prunty and friends returned to the Super 8 Motel in Fluharty's truck, while Wheeler, Spencer, and Day went to a nearby Omelette Shoppe.

Lisa Stover was a waitress who was working in the Omelette Shoppe that night. According to her trial testimony, she had known Wheeler for about two months, and they had dated for approximately two weeks. Wheeler came into the Omelette Shoppe at around 3:00 a.m., accompanied by two men, one of whom remained in the car. Wheeler told Stover that there had been a fight at the Holiday Inn and that someone dented the car with a ball bat. Stover testified that Wheeler was quite angry and upset, and that she offered him coffee and tried to get him to calm down.

When Wheeler's friend, Spencer, emerged from the restroom, Wheeler said that he was going to go mess the men up and that he would be back in fifteen minutes.

Wheeler returned first to the Eden's Lounge parking lot at the Holiday Inn. One of the three women, Debbie Williams, asked Wheeler why the men had started hitting the car. Wheeler reportedly told these women that he was going to see what the guy's problem was and that he would be back. The three women waited for a while, but eventually left.

When the truckers returned to the Super 8 Motel, Fluharty parked to the left of the motel in a gravel parking lot. Chipps talked briefly with the desk clerk, Mary Farruggia, and told her about what had happened that evening. Prunty remained in the parking lot and was apparently still carrying the tire iron. Chipps saw the car driven by Wheeler enter the parking lot and, according to Mary Farruggia, Chipps said, "Oh, God, it's them." Farruggia saw Chipps and Fluharty walk side by side towards the car. Two men suddenly stepped out from the driver and passenger side doors. The driver, Wheeler, had a gun and started shooting. Chipps stated that he "felt" a bullet go by when he was about fifteen to twenty feet from the car, and Fluharty yelled, "Chip, I've been shot."

Kevin Prunty testified that when he first saw the car driven by Wheeler pull into the Super 8 parking lot, he hid between the trucks. When he realized that Wheeler had a gun, he yelled to Fluharty, "Run, he's got a gun." Prunty heard one shot and then he was hit, at which time he dropped the tire iron. According to Chipps, after Wheeler stopped shooting, Wheeler said "sorry," and then "he just got in and shut the door and drove off."

At trial, the State called twenty-five witnesses and introduced thirty-nine exhibits as evidence to support its theory that on February 21, 1990, while driving Richard Spencer's car, Wheeler followed the victims to the Super 8 Motel parking lot, circled behind the motel, stopped by the entrance, stepped out of the driver's seat holding Spencer's semi-automatic weapon, and im- mediately fired at least five rounds at the victims, injuring both Prunty and Fluharty before leaving the scene. Fluharty sus- tained massive neck wounds and died from his injuries two days later.

Lisa Stover testified that several days after Wheeler was arrested, he called her from the Raleigh County Jail. Stover stat- ed that she asked what happened on the night in question. According to Stover, Wheeler "said that he killed the guy." When Stover told him she could not believe it, "he said that he was pretty mad that night."

The appellant presented no evidence and did not testify at trial. However, defense counsel attempted to characterize Wheel- er's actions as "excusable homicide by mis- adventure," rather than self-defense. The defense maintained that Fluharty, Chipps, and Prunty ran toward Wheeler's car after he circled the motel and that Prunty still had the tire iron in his hand as he ap- proached the car. These men continued to approach even when Wheeler stood outside of the car with the gun in his hand and *fired two warning shots*. Then, as Wheel- er was getting back into the car, *the gun accidentally discharged three more times*, and he shot both Prunty and Fluharty by accident. The defense admits that no evi- dence was presented to support its theory that Wheeler fired "warning shots," and then "accidentally" discharged the gun, but states that this was because neither the defendant nor Gerald Day testified at trial.

On appeal, the appellant's primary as- signments of error are related to an allega- tion that the State withheld certain witness statements which contained exculpatory in- formation until after the witnesses testified on direct examination. The appellant ar- gues that this constitutes reversible error because it deprived him of his constitution- al right to due process of law.

The appellant explains that because he did not receive the statements until after the trial began, defense counsel was forced to request a recess after each direct exami- nation in order to review the witness's statements. However, the appellant ar- gues that because each of the statements

contained exculpatory information, they were subject to early disclosure.[1]

On May 29, 1990, defense counsel filed a discovery motion requesting that the prosecution disclose any evidence which may be relevant, favorable, or tend to exculpate the appellant, as well as the pretrial production of all witness statements which would be discoverable under Rule 26.2 of the West Virginia Rules of Criminal Procedure. On July 26, 1990, the trial court denied the appellant's motion for early disclosure of certain witness statements, but advised counsel that after the witness had testified, "you will be given ample opportunity to study the statement before you are required to cross-examine."

■ The prosecution's position, then and now as the point is once again raised on appeal, is that witness statements do not have to be provided under Rule 26.2 until after that witness testifies on direct examination. We agree. The rule clearly provides that:

"After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the State or the defendant and his attorney, as the case may be, to produce for the examination and use of the moving party any statement of the witness that is in their possession that relates to the subject matter concerning which the witness has testified." Rule 26.2, West Virginia Rules of Criminal Procedure.

Syl. pt. 1, *State v. Tanner*, 175 W.Va. 264, 332 S.E.2d 277 (1985).

In its initial July 6, 1990, response to a defense request for the defendant's statements, the State provided the following statement:

The defendant with Richard Spencer at the Omelette Shoppe on Harper Road discussed the fact that they had a dispute with the victims and that they were going to take care of it, or "f—k them up." In the car before the murder, the defendant told Spencer he wished he had a gun. Wheeler after the shooting told his two companions that they were all in trouble, going to prison and that they should say nothing. The defendant suggested a fabricated story, to claim that the gun was "just laying there" in the car and had just been purchased.

The "f—k them up" statement was not directly attributed to the appellant, and the appellant charges that the prosecution was deliberately vague in its discovery response, indicating only that Spencer and Wheeler discussed "f—king them up" without specifying whether it was Wheeler or Spencer who made the actual statement.[2]

On August 11, 1990, two days before the trial was scheduled to begin, the prosecutor called to inform defense counsel about a statement made by the defendant that had not previously been provided. The appellant complains that the prosecution did not tell defense counsel during that phone conversation that Lisa Stover was actually attributing the statement about "f—king them up" to Wheeler, rather than his co-defendant, Richard Spencer.

---

1. According to the appellant, the statements of Debbie Williams, Lisa Stover, Mary Farruggia, Kevin Prunty, and Eugene Chipps all contain evidence which supports his claim that he was preparing to act in self-defense when the shootings occurred, including evidence that (1) Kevin Prunty was armed with a large tire iron immediately preceding the shooting, (2) that Prunty used the tire iron to hit the car Wheeler was driving earlier in the evening, (3) that Fluharty, Chipps, and Prunty were the aggressors in various incidents which occurred throughout the early morning hours, and (4) that these three men were either walking or running toward Wheeler's car and were quite close to it immediately preceding the shooting.

2. In a letter dated August 3, 1990, the prosecution informed defense counsel that it also intended to introduce the following statements made by Wheeler before the shootings: "You all don't know who you're f—king with" and "I'm not going to let them get away with f—king up my car—I'm gonna f—k them up." Additionally, the prosecution provided these statements that it alleged Wheeler made after the shootings: "It'll be hard to say it's self-defense when I've shot one of them in the face"; "I'll be goddamned if I'll turn myself in—I'm going to Florida"; and "I'm Moundsville bound, buddy."

An *in camera* hearing was held on several defense motions before the trial began. At that time, defense counsel renewed motions to force the prosecution to disclose certain witness statements prior to trial testimony and to suppress all statements made by the defendant which were not disclosed during discovery. The defense objected to the lateness with which it claimed to have learned that Lisa Stover attributed the "f—k them up" statement to Gary Wheeler. However, the trial court denied the defense motion to suppress Lisa Stover's testimony about this statement.

In response to the appellant's charge that the prosecution withheld what the defense characterizes as exculpatory information, the prosecution points out that the defense first received notice during testimony given at a preliminary hearing on March 5, 1990—five months before trial— that it was Wheeler who stated that he would "mess up" the victims. Also, in pretrial testimony at the *in camera* hearing, Lisa Stover stated that Wheeler's phrase was "mess up" and that the co-conspirator, Spencer, said "f—k up." Finally, the State submits that it is inconceivable that the defense was surprised, hampered, or prejudiced in any manner by Ms. Stover's testimony that Wheeler's precise terminology was actually "mess up", as opposed to "f—k up." [3] We agree. There is simply no evidence in the record to support defense counsel's contention that the State withheld exculpatory evidence or that the appellant was in any manner denied his constitutional rights.

The defense relies primarily on Lisa Stover's statements to support its contention that the prosecution withheld exculpatory evidence, maintaining that Stover's statements were the only evidence relating to the critical element of premeditation. In syllabus point 4 of *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982), this Court stated that "[a] prosecution that withholds evidence which if made available would tend to exculpate an accused by creating a reasonable doubt as to his guilt violates due process of law under Article III, Section 14 of the West Virginia Constitution." We conclude that there was no exculpatory evidence which the prosecution was obligated to disclose in this case.

Moreover, we do not believe the prosecution's refusal to disclose Lisa Stover's statement prior to her testimony left the defense without adequate time to prepare an effective cross-examination. The defense claims that because the prosecution would not disclose certain statements to them prior to her testimony, Lisa Stover was not questioned about her "crucial" prior inconsistent statements. However, our careful review of the record reveals that defense counsel knew about potential inconsistencies in Stover's various statements long before she was called to testify.

We previously discussed how, on August 13, 1990, prior to Stover's *in camera* testimony, the defense requested that it be afforded an immediate opportunity to inspect Stover's statement to the police.

---

**3.** In her initial voluntary statement several hours after the shootings, Lisa Stover told the police that "the other guy" [Spencer] said ". . . he was going to f—k em up." During a preliminary hearing on March 5, 1990, Detective Pack, one of the investigating officers in this case, referred to an unidentified source who was working in the Omelette Shoppe that evening. Although Lisa Stover was not referred to by name during this hearing, defense counsel was no doubt aware of her identity. Detective Pack stated that it was Gary Wheeler who did most of the talking to the "informant." When asked if Wheeler said anything about why he was going back to the Super 8, Pack responded that, according to the informant, "[h]e just stated that they had had a problem earlier and he was going to go down and mess them up."

In another statement taken by defense investigator A.C. Bartlett on April 4, 1990, Lisa Stover said that, "Gary didn't make any comment about hunting the other guys. The guy with Gary said he was going to f—k the guys up and Gary said to him no, calm down a little bit."

At the pretrial *in camera* hearing, defense counsel asked Stover specific questions about her statement to Bartlett. Stover was asked, "With regard to the statements of going to mess up these other individuals, what specifically do you recall Gary Wheeler saying?" Stover said, "He said he was going to go mess them up." Stover also indicated that Spencer said, "We're going to go f—k them up."

Even then, before trial, the prosecution argued that the defense had no right to claim "surprise":

> DEFENSE COUNSEL: The other problem is that at the preliminary hearing and all previous hearings they [the State] said that the girl at the Omelette Shoppe [Lisa Stover], who they relied on heavily at the preliminary, had given statements. Okay. We want these statements now, since [the prosecution] is saying this is one of the statements attributed to Gary Wheeler. We understood, at the preliminary, that she [Stover] attributed other statements to Gary Wheeler.
>
> PROSECUTOR: Yeah. The only other conversation is, which you've known forever, which is that Wheeler and Spencer go into the Omelette Shoppe right before the shooting, *they're angry and say, basically, someone messed up our car, we're going to go mess them up. And you've known that forever....* under the discovery rules, so long as the State isn't withholding information and the defendant is not surprised, they have no grounds to suppress. She's here.
>
> DEFENSE COUNSEL: Your honor, ... I don't think we're asking for a lot and I think that the rule does permit it ... we want everything that the State has. As far as statements that [the prosecution] has, we want it all because, at this point, because of the lateness ... but what we want is we want to be able even for the *in camera* hearing, and for the preparation, for our opening, for everything, we want to know what she told the police.

It is clear from this exchange that defense counsel already knew that Stover's initial statements to the police differed somehow from certain subsequent statements. For this reason, the defense cannot possibly claim now that "the State's withholding of the witness statements until after the witnesses' direct examinations deprived the defendant of the time to prepare for and achieve effective cross-examination."

▆ In syllabus point 2 of *State v. Grimm,* 165 W.Va. 547, 270 S.E.2d 173 (1980), this Court stated that when a trial court grants a pretrial motion requiring the prosecution to disclose evidence, "non-disclosure by the prosecution is fatal to its case where such non-disclosure is prejudicial. The non-disclosure is prejudicial where the defense is surprised on a material issue and where the failure to make the disclosure hampers the preparation and presentation of the defendant's case." This same reasoning should certainly apply to a situation in which the court did not order that certain materials be disclosed early. In this case, we find no prejudice. The defense simply cannot claim that it was surprised on a material issue. If cross-examination of Lisa Stover was ineffective, it was not because the prosecution withheld exculpatory evidence. There was obviously a decided lack of any evidence which was favorable to the appellant in this case.

Next, we consider the appellant's contention that the trial court committed reversible error by admitting twelve "gruesome" photographs and two "blood-stiffened garments" into evidence. The appellant maintains that these items were not essential to the State's case.

▆ The disputed photographs showed trails of blood and basically depicted Kevin Prunty's location at the time of the shooting, as well as the route he took back to the hotel room following the shooting, i.e., blood on pavement, blood on a door, blood on carpet, etc. In *State v. Rowe,* 163 W.Va. 593, 259 S.E.2d 26, 28 (1979), this Court discussed what constitutes a "gruesome" photograph:

> Photographs that show much gore and blood, or emphasize contorted facial or bodily features, or depict a body after autopsy procedures; and color photographs and enlargements of particular areas of a corpse magnifying its revolting aspects will be more likely condemned as gruesome.

In *State v. Clawson,* 165 W.Va. 588, 270 S.E.2d 659 (1980), we determined that:

> The fundamental rationale barring the introduction of gruesome photographs is that their impact on the jury is such that it will become so incensed and inflamed at the horrible conditions depicted that it

will not be able to objectively decide the issue of the defendant's guilt.

In the case now before us, the trial judge did not consider the photographs to be of a gruesome nature, and he stated further that the photos would simply serve to show the jury things that they had already observed during the jury view. In *State v. Deskins*, 181 W.Va. 112, 380 S.E.2d 676 (1989), at syllabus point 4, we recognized that:

> " 'As a general rule photographs of persons, things, and places, when duly verified and shown by intrinsic evidence to be faithful representations of the objects they purport to portray, are admissible in evidence as aids to the jury in understanding the evidence; and whether a particular photograph or groups of photographs should be admitted in evidence rests in the sound discretion of the trial court and its ruling on the question of the admissibility of such evidence will be upheld unless it clearly appears that its discretion has been abused.' Syl. pt. 1, *Thrasher v. Amere Gas Utilities Co.*, 138 W.Va. 166, 75 S.E.2d 376 (1953), *appeal dismissed*, 347 U.S. 910, 74 S.Ct. 478, 98 L.Ed. 1067 (1954)." Syllabus Point 2, *State v. Dunn*, 162 W.Va. 63, 246 S.E.2d 245 (1978).

We are not persuaded that the lower court abused its discretion by admitting these photos into evidence and, therefore, we find no reversible error on this point.[4]

The appellant's remaining assignments of error relate to charges of prosecutorial misconduct. First, the appellant argues that the prosecutor "abdicated her quasi-judicial role" and inflamed the passions and prejudices of the jury when she elicited irrelevant testimony which was calculated to arouse the jury's sympathies for Gary Fluharty's wife. In addition, the appellant contends that the prosecutor appealed to the fears of the jury by repeatedly referring to the gun as an "assault weapon", and by eliciting testimony which dwelled on particularly gruesome or morbid aspects of the case, such as Kevin Prunty's "trail of

blood" and Prunty's own testimony that one of the bullets still remained in his body.

The State responds to these allegations by stating that Gary Fluharty's widow simply testified as to his identity and his date of death, both of which are relevant to any murder case. Further, the State argues that the police officer's testimony about "the trail of blood" was necessary to prove Kevin Prunty's location when he was shot and his route after he was shot. Finally, the State maintains that the prosecutor accurately described the Cobray nine millimeter semi-automatic pistol used by Wheeler as an "assault weapon," and not only was there no objection to this description, but defense counsel used the same description. The State argues that the defense did not object to either this testimony or that of victim Kevin Prunty, and thus error, if any, was waived.

■ With regard to the final two allegations, the State is correct in its assertion that any error was waived by virtue of the defense's failure to object. " 'Error in the admission of testimony to which no objection was made will not be considered by this Court on appeal or writ of error, but will be treated as waived.' Syl. pt. 4, *State v. Michael*, 141 W.Va. 1, 87 S.E.2d 595 (1955)." Syl. pt. 7, *State v. Davis*, 176 W.Va. 454, 345 S.E.2d 549 (1986). Moreover, we find nothing particularly inflammatory about the police officer's so-called "trail of blood" testimony. As we have already noted, this testimony was relevant to show the victim's relative position at the time of and following the shooting.

■ Finally, we note that the prosecution correctly described the weapon the appellant used in his assault upon the truckers as a "Cobray nine millimeter semi-automatic pistol." This fact was confirmed by defense counsel's own discussion of the gun in his opening statement:

> ... it is a nine-millimeter, semi-automatic. The paper called it an uzi. The prosecutor talked assault weapon. You'll see the gun; it's a pistol. It's not an ordinary revolver or anything like that, it is

---

4. With regard to the admission of Prunty's blood-soaked clothes, the State maintains that although they were admitted into evidence, they

remained hidden from the jury's view and were not included among the exhibits given to the jury during its deliberations.

bigger than that, but it fires no different-ly than any other gun. You have to pull the trigger each time you want to fire it, although the testimony will be that the type of gun it is, it will fire faster than a revolver.

Although the appellant objects to the prosecution's allegedly numerous references to the gun as an "assault weapon," we find that the prosecutor's description of the gun as such was based in fact and was not out of line or in any way inflammatory.

Far more troubling to this Court is the State's decision to have Gary Fluharty's widow testify in this case. Defense counsel objected when the prosecution called Kim Fluharty to testify. Both parties then approached the bench, and the defense asserted that Mrs. Fluharty was not present at the time of the shootings and could offer no relevant information. The prosecution stated that Mrs. Fluharty, a registered nurse, would testify as to identification of the deceased, explaining that "then, I don't have to call the doctor at the Charleston hospital about when they had to take him off the ventilator." Defense counsel reiterated its objection, maintaining that the prosecution's sole purpose in having Mrs. Fluharty testify was to arouse sympathy for her as a widow.

The trial judge cautioned the prosecutor not to ask Mrs. Fluharty questions designed to do just that, such as whether she misses her husband. The prosecution's direct examination of Mrs. Fluharty proceeded without any suggestive or inflammatory remarks. Mrs. Fluharty stated that she and Gary Fluharty had been married for eight months and she identified her husband by means of a portrait of them that was admitted into evidence.[5]

Generally, evidence that a homicide victim was survived by a spouse or children is considered inadmissible in a homicide prosecution where it is irrelevant to any issue in the case and is presented for the sole purpose of gaining sympathy from the jury. For this reason, courts tend to look upon testimony by a surviving spouse with disfavor. However, the admission of such evidence does not necessarily constitute reversible error.[6]

In *State v. McCausland*, 82 W.Va. 525, 96 S.E. 938 (1918), the State used the widow of a deceased as a witness, over the objection of the accused. The widow testified that her late husband was the father of several children, including one who was born after his father's death. The defen-

---

5. The entire text of Kim Fluharty's testimony is as follows:

> Q. Would you state your name, please, ma'am? A. Kim Fluharty. Q. Where do you live, Mrs. Fluharty? A. 335 South Court Street, Harrisville. Q. You were married to Gary Fluharty; is that right? A. Yes. Q. And how long had you and Gary Fluharty been married before he was killed? A. Eight months.
>
> Q. How are you employed? A. I'm a nurse at St. Joe Hospital. Q. Is that up in the Harrisville area? A. No, in Parkersburg. Q. I'm going to show you a photograph that has been marked for identification as State's Exhibit 2 for identification purposes. Would you tell us who those people are, looking at that photograph? A. Gary and me. Q. In the month of February, 1990, and I guess for a long period before, your husband was employed with Rutherford Trucking; is that right? A. Yes. Q. And then on the early morning hours of February 21, 1990, did you come to Beckley, West Virginia. A. Yes, I did. Q. And did you receive a call that made you come to Raleigh General Hospital. A. Yes. Q. Now, when you got to Raleigh Gen-

eral in the early morning hours of February 21, 1990, was Gary still at the hospital here? A. No. They had life-flighted him to CAMC in Charleston. Q. And so where did you go then, to the Charleston Hospital? A. Yes. Just as soon as we got there, they told us, and we left. Q. When you say "we," who were you with? A. My mom and my aunt and Kevin's wife, Carolyn. Q. Kevin Prunty's wife? A. Uh-huh (yes). Q. When you got to the hospital in Charleston, what were they doing, was he in surgery, was he out of surgery? A. Yeah, they had—well, first of all, they did a lot of X-rays on him, and then they took him to surgery. He was in surgery for about five hours, I believe. Q. And then that would have gone through Wednesday and then through Thursday; is that right? A. Yes. Q. And then on Friday, February 23, 1990, was when he died; is that right? A. Yes. MS. KELLER: That's all. MR. POLING: No questions, Your Honor.

6. *See generally*, J.D. Ludington, Annotation, *Admissibility and propriety in homicide prosecution, of evidence as to deceased's spouse and children*, 67 A.L.R.2d 731 (1959).

dant's conviction was reversed by this Court on several grounds, one of which was the use of this testimony:

> This evidence did not in any way prove any issue involved in the case. The trouble between the accused and the deceased did not arise out of any matter with which his family was in any wise connected. The evidence was patently introduced for the sole purpose of creating sympathy in the minds of the jury for the widow and the orphan children, manifestly an improper purpose. This evidence should not have been admitted.

*Id.*, 82 W.Va. at 532, 96 S.E. at 940.

Several years after *McCausland*, in *State v. Sauls*, 93 W.Va. 276, 116 S.E. 391 (1923), the defendant asserted various grounds for reversal of his second-degree murder conviction, among them the fact that the wife of the deceased was allowed to testify that they had a family.[7] Although the defendant's conviction was reversed and he was awarded a new trial, the reversal did not result from this alleged error. The Court stated:

> Of course the fact that deceased and the witness had a family had no direct bearing on the guilt of the accused, except perhaps on the theory that a man with a family would not likely be engaged in an effort to debauch defendant's wife and ruin his home, according to defendant's theory, justifying or excusing him for his killing. *We doubt whether the evidence according to the strict rule, should have been received,* but under the circumstances, we have no idea that the verdict of the jury was influenced thereby, and it is quite too technical a question on which to base a reversal.

*Id.*, 93 W.Va. at 285, 116 S.E. at 395 (emphasis added).

We note that when confronted with this issue, other courts strongly consider the weight of all the evidence presented at trial, as well as the manner in which the objectionable and perhaps improper references to the victim's family were made. For example, in *People v. Hyde*, 1 Ill. App.3d 831, 275 N.E.2d 239 (1971), the widow of a murder victim was called by the State for the purposes of identification. The woman testified that she was the widow and that she and the deceased had six girls, two of whom still lived at home. She identified four photographs of the deceased, with two recent photos showing him either holding or sitting with a child in his home.[8]

The widow also testified that she identified her husband's body at the hospital. Defense attorneys did not object to the widow's testimony concerning the family of the deceased. Additionally, two different prosecutors made separate remarks alluding to the victim as an innocent man with a wife and children, just trying to do his job and earn his living.

On appeal, the Court cited the well-established rule that "it is improper for a prosecutor to refer to the family of a murder victim, whether such reference be made by evidence or in argument." *Id.*, 275 N.E.2d at 245. However, the Court went on to reason that:

> ... the mere fact that evidence of a victims wife and family appears incidentally in the trial or is the subject of comment by the prosecutor in his argument does not automatically require reversal. The materiality of the testimony or comments, and *the manner of its presentation must be considered* ... It is proper to inquire to what extent, for what reason and to what effect testimony or comments regarding the deceased's family are advanced.

*Id.* The Court also noted that:

> [T]he prosecutor made no attempt to dwell upon or draw out the testimony

---

7. The widow's entire testimony on this point consisted of the following: "Q. How old was your husband at the time he was killed? A. He was on thirty-eight. Q. How long had you been married? A. About 19 year. Q. What? A. About 19 year. Q. A family? A. Yes, sir." *Id.* at 394.

8. The State maintained that the photos "were a necessary link in the chain of tracing the body

of the man shot at Lee's Wash Rack to the man who was identified at Desloge Hospital by his widow and were therefore a necessary part of the State's case." *Id.*, 275 N.E.2d at 244. The photos were admitted into evidence after defense counsel refused to stipulate that the earlier photos taken some years ago were a reasonable likeness of the deceased at the time of his death.

regarding the deceased's family. No attempt was made to present it as an issue in the case or a matter proper to be proven and considered. Its materiality was in no way suggested. Its presentation was incidental to the matter of identification of deceased and its effect upon the outcome of the trial minimal.

*Id.* at 245–46. Thus, the Court did not find reversible error on this point. Instead, the Court emphasized that "[t]he conviction here is not based upon circumstantial evidence but upon eyewitness testimony and positive identification." The Court concluded that "... the conviction of defendant was the result of the strong evidence of guilt and did not result from any passion or prejudice that may have been engendered by improper evidence and argument regarding deceased's family." *Id.* at 246.

 As we previously noted, the prosecution in the case now before us maintains that Mrs. Fluharty was called to testify solely for the purposes of identifying the deceased and establishing his date of death. Our review of the record confirms that her testimony was indeed limited in this respect. Furthermore, we can discern no attempts by the prosecution to exploit her grief so as to tug at the heartstrings of the jury. In syllabus point 2 of *State v. Kennedy*, 162 W.Va. 244, 249 S.E.2d 188 (1978), this Court explained that:

> Great latitude is allowed counsel in argument of cases, but counsel must keep within the evidence, not make statements calculated to inflame, prejudice or mislead the jury, nor permit or encourage witnesses to make remarks which would have a tendency to inflame, prejudice or mislead the jury.

Because of the great latitude that counsel is permitted in presenting its case, and because the State presented overwhelming evidence of Wheeler's guilt, we do not believe that the fact that Mrs. Fluharty was permitted to testify constitutes adequate grounds for reversal. However, we strongly caution the prosecution against the future use of this type of potentially incendiary testimony. In a closer case, the mere use of such testimony could possibly justify reversal.

We have reviewed the errors asserted by the appellant and found none which warrant reversal. Therefore, we hereby affirm the appellant's convictions.

Affirmed.