509 S.E.2d 842

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Michael Daniel SALMONS, Defendant Below, Appellant.**

No. 24967.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 15, 1998.

Decided Nov. 4, 1998.

Ira Mickenberg, Gregory Ayers, Assistant Public Defenders, Charleston, West Virginia, Attorneys for the Appellant.

Darrell V. McGraw, Jr., Attorney General, Barbara H. Allen, Managing Deputy Attorney General, Charleston, West Virginia, Attorneys for the Appellee.

William C. Forbes, Kanawha County Prosecuting Attorney, Jon R. Blevins, Assistant Kanawha County Prosecuting Attorney, Charleston, West Virginia, Attorneys for the Appellee.

DAVIS, Chief Justice:

Mr. Salmons, defendant below/appellant, (hereinafter "Mr. Salmons"), appeals a final judgment by the Circuit Court of Kanawha County convicting him of and sentencing him for the crimes of kidnaping and aggravated robbery. Mr. Salmons was sentenced to thirty years confinement for the aggravated robbery conviction. He was sentenced to life imprisonment with mercy for the kidnaping conviction. The sentences run concurrently. Mr. Salmons now seeks a new trial on the grounds that (1) the State failed to disclose exculpatory evidence, (2) the trial court improperly struck for cause two jurors, and (3) the trial court failed to advise him of his right to testify. Having reviewed the evidence, the parties' arguments and the applicable authority, we affirm the decision of the Circuit Court of Kanawha County.

## I.

### FACTUAL AND PROCEDURAL HISTORY

On March 27, 1996,[1] at approximately 5:30 p.m., in Charleston, West Virginia, Mr. Philip Myles,[2] the victim in this case, drove to a bar called the Tap Room.[3] Shortly after Mr. Myles arrived at the bar, Mr. Salmons entered the bar. Mr. Salmons was followed by four other accomplices.[4] Mr. Myles and Mr. Salmons eventually engaged in a conversation and had drinks.[5] Mr. Salmons' four

---

1. Mr. Salmons' brief cited the date February 27, 1996. However, the evidence at trial and the indictment confirm the incident date of March 27, 1996.

2. Mr. Myles was employed as a paralegal by the Attorney General of West Virginia.

3. Mr. Myles drove to the bar with a friend, Daryl Adams. Mr. Adams left the bar before Mr. Myles departed.

4. Mr. Salmons' four accomplices were his brother Blaine Salmons, Kim Porter, John Murphy and an individual called Mariah.

5. During Mr. Salmons' trial, Kim Porter was called by the State to testify against him. During her testimony, Kim related the motive in going to the bar:

> Q. After you were introduced to Blaine [Salmons], did you and Blaine have conversations?
> A. Yes, sir.
> Q. And did you have conversations relating to the possibility of going to Florida?
> A. Yes, sir.
>
> * * * * * *
>
> Q. And after you met Michael Salmons, were there any conversations?
> A. Yes, sir.
> Q. What were those conversations about?

accomplices left the bar after a brief period. At approximately 6:30 p.m., Mr. Myles left the bar with Mr. Salmons and went directly to his car. While standing next to the car, Mr. Salmons asked Mr. Myles to join him in a game of pool. Mr. Myles declined and indicated he had to go home. According to the trial testimony of Mr. Myles, after he declined to play pool, Mr. Salmons "asked me again and I said no, I don't want to, and I started to put my keys in the car and [Mr. Salmons] grabbed me by the shirt here and started wrestling me, then he started motioning like this in the alley." The motioning gesture by Mr. Salmons was a signal to his four accomplices, who had been waiting in an alley since leaving the bar.[6] Mr. Myles testified as follows to the ensuing events:

Q. What happened then?

A. All the people that had left the bar came out of the alley. They were hiding in a little alcove in the alley and they started beating on me and dragging me through the alley.

Q. Now when you say all the people who left the bar, who are we talking about?

A. Kim Porter, Blaine Salmons, and the two other people that I didn't know.

Q. And they come out of the alley, they start beating on you and dragged you back to the alley?

A. They dragged me back into the alley where they were hiding in that alcove and they were beating me and kicking me and I was on the ground at one point and

> A. About going to Florida, sir.
>
> * * * * * *
>
> Q. Did there come a time when Michael and Blaine Salmons approached you about actually going to Florida?
> A. There were conversations about it, yes.
> Q. And did there come a time when a plan was developed and it was time to go?
>
> * * * * * *
>
> Q. What was that plan?
> A. We would go to the Tap Room on Quarrier Street and we would find a gay guy with a fat wallet that had a lot of money and we would take their car and stuff and go to Florida and put him in the trunk.

**6.** Kim Porter described the events to the jury as follows:

then Blaine Salmons put my hands up over my head and slams me into the wall.

* * * * * *

Q. What happens next?

A. Everyone started going through my pockets and took everything I had and [Mr. Salmons] took my car keys and went back to get the car and drove it over to where we were.

Mr. Myles was forced into the car.[7] Mr. Salmons then drove away with Mr. Myles and his four accomplices. Mr. Salmons drove to Boone County and picked up an individual named Matthew Callahan. Mr. Salmons then returned to Charleston and dropped off two accomplices, John Murphy and Mariah. Next, Mr. Salmons drove to Mr. Myles' apartment. Upon arriving at the apartment, Mr. Salmons and Matthew Callahan got out of the car and went into Mr. Myles' apartment. Mr. Myles attempted to escape while the car was parked near his apartment. He bolted from the car and began running and screaming for help. Blaine Salmons ran after Mr. Myles and caught him. Blaine dragged Mr. Myles back to the car. Kim Porter struck Mr. Myles in the head with an object several times. Mr. Myles began bleeding. Mr. Salmons and Matthew Callahan returned carrying items stolen from Mr. Myles' apartment.

After leaving Mr. Myles' apartment, Mr. Salmons drove to Lewis County. Kim Porter described the events that next occurred as follows:

> A. We were waiting in the alley for about five minutes and then Michael and Mr. Myles had come out of the bar and they was [sic] in the parking lot for a few minutes and we kept looking around the corner and everyone started running. Me, John and Mariah ... and Blaine—
> Q. Let me interrupt you. Which way were you running?
> A. Towards Michael and Mr. Myles. I'm sorry.
> Q. What was the intention of you all running in that direction.
> A. To get him in the alleyway.
> Q. Get who?
> A. Mr. Myles in the alleyway and rob him and put him in the trunk and head to Florida.

**7.** Mr. Myles' car was a 1995 hatchback Camaro.

Q. Once you all got back in the car, what, if anything, happened?

A. When we got in the car, we went up in a hollow, I don't know where it was located, and Matthew was talking about, you know, his family's land or something, and he was talking about, you know, we could kill him and no one would find his body there. So we went a long ways up there and everyone had forced Mr. Myles out of the car and we all had gotten out and Blaine had tried to get Mr. Myles to fight him and he wouldn't, so all of a sudden he just started throwing punches.

Q. Who's that that started throwing punches?

A. Blaine. And then everyone started taking turns on beating him.

Q. Who were they beating?

A. Mr. Myles

\* \* \* \* \* \*

Q. When the beatings were over, what did you think, what did you think about Mr. Myles?

A. He was on the ground, he was laying and blood was everywhere and I was scared. I thought he was dead.

After the beating, Mr. Myles was again forced into the car. Mr. Salmons and his accomplices then forced Mr. Myles to ride with them as far as Georgia.[8] While in Georgia, Blaine Salmons decided he wanted to return to Charleston. Mr. Salmons and his accomplices agreed. At that point, Mr. Myles was instructed to drive the car. On March 29, 1996, Mr. Myles drove into Charleston with his abductors. Mr. Salmons and his accomplices got out of the car leaving Mr. Myles by himself. Mr. Myles was given a note by his abductors when they left him. The note read:

Philip, we all just want you to know that we're sorry and we hope that you don't go to the police because we'll get away and then we'll be back for you but if you just forget about everything, we'll never come after you again but if you get one of the

Crips in trouble, you will be a dead man so think smart before you do something stupid because you can't get us all and you know that. Just go on with your life and don't make us have a reason to come back for you. Peace.

Subsequent to Mr. Myles' release by his abductors, a grand jury returned an indictment against Mr. Salmons charging him with kidnaping and aggravated robbery in the abduction of Mr. Myles.[9] On November 22, 1996, a jury found Mr. Salmons guilty of both charges. On February 18, 1997, the trial court sentenced Mr. Salmons to thirty years imprisonment on the aggravated robbery conviction, and life imprisonment with mercy on the kidnaping conviction. The sentences were ordered to run concurrently. From this sentencing, Mr. Salmons appeals to this Court.

## II.

## DISCUSSION

### A. The Failure to Disclose Exculpatory Evidence

Mr. Salmons' first assignment of error involves a statement given to the police by Jeffrey Huff. Mr. Huff was at the Tap Room bar at the time of Mr. Myles' abduction. Mr. Huff informed police investigating the crime that, as Mr. Myles left the bar, Mr. Myles stated that he was taking Mr. Salmons home. Mr. Huff's statement was never provided to Mr. Salmons. Mr. Salmons contends in this appeal that failure to produce the statement to him violated the disclosure principles articulated in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); Rule 26.2 of the West Virginia Rules of Criminal Procedure; and Rule 612(b) of the West Virginia Rules of Evidence.

▮▮▮ Before considering the *Brady* assignment of error, we must first decide whether the *Brady* issue is properly before this Court. "We are duty bound to take up [this] issue sua sponte, because it implicates the scope of our appellate jurisdiction."

---

8. Mr. Salmons and his accomplices financed their journey using Mr. Myles' credit cards.

9. The same indictment also charged Blaine Salmons, Matthew Callahan and Kim Porter with kidnaping and aggravated robbery.

*Province v. Province,* 196 W.Va. 473, 478 n. 11, 473 S.E.2d 894, 899 n. 11 (1996). The record does not indicate how or when Mr. Salmons first learned of Mr. Huff's statement. Mr. Salmons' brief mentions, in a footnote, that the defense was unaware of the statement during the trial. The State acknowledges the existence of the statement and has briefed the issue. Regardless of these facts, it appears that the issue of Mr. Huff's statement was never presented to the trial court, as there is no court order or hearing transcript directly addressing Mr. Huff's statement evidencing that the trial court had an opportunity to rule on the matter.[10] While the parties apparently agree that this Court should consider the present issue, we are not bound to hear it. "Courts are never bound by the acts or agreements of the parties." *Bartles v. Hinkle,* 196 W.Va. 381, 388, 472 S.E.2d 827, 834 (1996).

 We have held that "[a]s a general rule, proceedings of trial courts are presumed to be regular, unless the contrary affirmatively appears upon the record, and errors assigned for the first time in an appellate court will not be regarded in any matter of which the trial court had jurisdiction or which might have been remedied in the trial court if objected to there." Syl. pt. 17, *State v. Thomas,* 157 W.Va. 640, 203 S.E.2d 445 (1974). "We have invoked this principle with a near religious fervor. This variant of the 'raise or waive' rule cannot be dismissed lightly as a mere technicality. The rule is founded upon important considerations of fairness, judicial economy, and practical wisdom." *State v. Miller,* 197 W.Va. 588, 597, 476 S.E.2d 535, 544 (1996). *See* Syl. pt. 4, *State v. Browning,* 199 W.Va. 417, 485 S.E.2d 1 (1997) ("This Court will not consider an error which is not properly preserved in the record nor apparent on the face of the record."); *State v. Grimmer,* 162 W.Va. 588, 595, 251 S.E.2d 780, 785 (1979) ("When there is an opportunity to speak, silence may operate as a waiver of objections to error and

irregularities at the trial which, if seasonably made and presented, might have been regarded as prejudicial.").

The philosophy underlying this Court's refusal to address objections raised for the first time on appeal was artfully explained in *Wimer v. Hinkle,* 180 W.Va. 660, 663, 379 S.E.2d 383, 386 (1989), as part of a design "to prevent a party from obtaining an unfair advantage by failing to give the trial court an opportunity to rule on the objection and thereby correct potential error." We elaborated on this matter in *Whitlow v. Board of Educ. of Kanawha County,* 190 W.Va. 223, 226, 438 S.E.2d 15, 18 (1993), as follows:

> The rationale behind this rule is that when an issue has not been raised below, the facts underlying that issue will not have been developed in such a way so that a disposition can be made on appeal. Moreover, we consider the element of fairness. When a case has proceeded to its ultimate resolution below, it is manifestly unfair for a party to raise new issues on appeal. Finally, there is also a need to have the issue refined, developed, and adjudicated by the trial court, so that we may have the benefit of its wisdom.

In *State v. LaRock,* 196 W.Va. 294, 316, 470 S.E.2d 613, 635 (1996), we expounded further:

> Our cases consistently have demonstrated that, in general, the law ministers to the vigilant, not to those who sleep on their rights.... When a litigant deems himself or herself aggrieved by what he or she considers to be an important occurrence in the course of a trial or an erroneous ruling by a trial court, he or she ordinarily must object then and there or forfeit any right to complain at a later time. The pedigree for this rule is of ancient vintage, and it is premised on the notion that calling an error to the trial court's attention affords an opportunity to correct the problem before irreparable harm occurs. There is

---

**10.** While the trial court did not rule upon the *Brady* issue regarding the statement of Mr. Huff specifically, it did address the Rule 26.2 and Rule 612(b) arguments in the context of a request for a "police grand jury report," which happened to include a copy of Mr. Huff's statement. *See infra*

Part II, § A(2) and A(3). In this first assignment of error, Mr. Salmons has focused upon a specific document that was part of the "police grand jury report," i.e., Mr. Huff's statement. At trial, Mr. Salmons was unaware of and therefore did not specifically request Mr. Huff's statement.

also an equally salutary justification for the raise or waive rule: It prevents a party from making a tactical decision to refrain from objecting and, subsequently, should the case turn sour, assigning error (or even worse, planting an error and nurturing the seed as a guarantee against a bad result). In the end, the contemporaneous objection requirement serves an important purpose in promoting the balanced and orderly functioning of our adversarial system of justice.

*See Hanlon v. Logan County Bd. of Educ.*, 201 W.Va. 305, 315, 496 S.E.2d 447, 457 (1997) ("Long standing case law and procedural requirements in this State mandate that a party must alert a tribunal as to perceived defects at the time such defects occur in order to preserve the alleged error for appeal."); *State ex rel. Cooper v. Caperton*, 196 W.Va. 208, 216, 470 S.E.2d 162, 170 (1996) ("The rule in West Virginia is that parties must speak clearly in the circuit court, on pain that, if they forget their lines, they will likely be bound forever to hold their peace.").

■ From what the record reveals to this Court, it is clear that the issue of Mr. Huff's statement should have been presented to the trial court in the first instance as a motion for new trial under Rule 33 of the West

Virginia Rules of Criminal Procedure,[11] within ten days of the verdict or at some point thereafter as newly-discovered evidence.[12] *See State v. O'Donnell*, 189 W.Va. 628, 433 S.E.2d 566 (1993) (reversing trial court's denial of motion for new trial based upon newly-discovered evidence); *State v. Ward*, 188 W.Va. 380, 424 S.E.2d 725 (1991) (affirming denial of motion for new trial based upon failure to disclose evidence); *State v. Peyatt*, 173 W.Va. 317, 315 S.E.2d 574 (1983) (affirming circuit court's denial of motion for new trial based upon newly-discovered evidence); *State v. Kopa*, 173 W.Va. 43, 311 S.E.2d 412 (1983) (reversing case, but affirming trial court's denial of motion for new trial based upon newly-discovered evidence). Based upon the foregoing, we hold that, as a general matter, a defendant may not assign as error, for the first time on appeal, an issue that could have been presented initially for review by the trial court on a post-trial motion.

As we indicated above, ordinarily this Court will decline, on a direct appeal, to consider the merits of an assignment of error in a criminal case that was not initially presented to the trial court. Traditionally, though, this Court has been a diligent protector of a criminal defendant's constitutional right to a fair trial. *See, e.g., State ex rel.*

---

11. Rule 33 states in full:

The court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice. If trial was by the court without a jury the court on motion of a defendant for a new trial may vacate the judgment if entered, take additional testimony, and direct the entry of a new judgment. A motion for a new trial based on the ground of newly discovered evidence may be made only after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case. A motion for a new trial based on any other grounds shall be made within ten days after verdict or finding of guilty or within such further time as the court may fix during the ten-day period.

12. The five-prong standard for granting a new trial on the ground of newly-discovered evidence was restated in syllabus point one of *State v. Crouch*, 191 W.Va. 272, 445 S.E.2d 213 (1994):

A new trial will not be granted on the ground of newly-discovered evidence unless the case comes within the following rules: (1)

The evidence must appear to have been discovered since the trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained. (2) It must appear from facts stated in his affidavit that plaintiff was diligent in ascertaining and securing his evidence, and that the new evidence is such that due diligence would not have secured it before the verdict. (3) Such evidence must be new and material, and not merely cumulative; and cumulative evidence is additional evidence of the same kind to the same point. (4) The evidence must be such as ought to produce an opposite result at a second trial on the merits. (5) And the new trial will generally be refused when the sole object of the new evidence is to discredit or impeach a witness on the opposite side.

Of course, the newly-discovered evidence rule contained in *Crouch* will not apply where the State has suppressed exculpatory material. In this context, the constitutional due process standard requires only that the evidence would have a reasonable likelihood of affecting the jury verdict. *See State v. Frazier*, 162 W.Va. 935, 942 n. 5, 253 S.E.2d 534, 538 n. 5 (1979).

*Charleston Mail Ass'n v. Ranson*, 200 W.Va. 5, 488 S.E.2d 5 (1997) (balancing criminal defendant's right to fair trial against first amendment rights of news sources); *State v. Osakalumi*, 194 W.Va. 758, 461 S.E.2d 504 (1995) (examining criminal defendant's right to fair trial in light of negligent failure to preserve evidence); *State v. Franklin*, 174 W.Va. 469, 327 S.E.2d 449 (1985) (scrutinizing criminal defendant's right to fair trial by impartial jury where courtroom spectators wore badges demonstrably protesting defendant's allegedly illegal activities). *See generally* W. Va. Const. art. 3, § 14. As Justice Cleckley pointed out in *Miller*, 197 W.Va. at 598, 476 S.E.2d at 545,

> the "raise or waive" rule, though important, is a matter of discretion. Thus, like most rules, this rule admits of an occasional exception. Exceptions must be few and far between and, therefore, an appellate court's discretion should not be affirmatively exercised unless the equities heavily preponderate in favor of such a step.

Considering the weighty importance of the constitutional right to a fair trial, we feel that the circumstances of the instant appeal concerning newly-discovered evidence do, in fact, present the very narrow set of circumstances which would permit an exception to the raise or waive rule.[13] Therefore,

we hold that when a defendant assigns an error in a criminal case for the first time on direct appeal, the state does not object to the assignment of error and actually briefs the matter, and the record is adequately developed on the issue, this Court may, in its discretion, review the merits of the assignment of error.[14]

It is imperative that we draw a line of caution to defense counsels. "It must be emphasized that the contours for appeal are defined at the circuit court level by setting forth with particularity and at the appropriate time the legal ground upon which the parties intend to rely." *Cooper*, 196 W.Va. at 216, 470 S.E.2d at 170. As a general matter, trial judges must be given an opportunity to consider alleged errors so that corrections may be made, if warranted, at the trial level. Rule 33 embodies this principle by encouraging motions for a new trial within ten days of a verdict or soon thereafter based upon newly-discovered evidence. Judicial economy, efficiency, and respect for trial judges are advanced through affording trial judges the opportunity to address potential trial errors in the first instance. *See State v. Snider*, 196 W.Va. 513, 519, 474 S.E.2d 180, 186 (1996) ("An appellate court looks primarily to the persuasiveness of the trial court's reasons for

---

13. Another longstanding exception to the raise or waive rule is the plain error doctrine. We set forth the criteria for plain error in syllabus point 7 of *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995), wherein it was held that "[t]o trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects the substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Alleged errors of a constitutional magnitude will generally trigger a review by this Court under the plain error doctrine. Allegations without a prima facie basis of support in the record will not establish the level necessary for a plain error analysis. The mere fact that an alleged error was not addressed by the trial court does not, alone, preclude this Court's use of the plain error doctrine. Indeed, our cases have held that this Court may "take notice of error ... even though such error was not brought to the attention of the trial court." Syl. pt. 4, in part, *State v. England*, 180 W.Va. 342, 376 S.E.2d 548 (1988). *See State ex rel. Morgan v. Trent*, 195 W.Va. 257, 261 n. 5, 465 S.E.2d 257, 261 n. 5 (1995); Syl. pt. 6, *State v. Mayo*, 191 W.Va. 79, 443 S.E.2d 236 (1994); Syl. pt. 1, *State v. Hanson*, 181 W.Va. 353, 382 S.E.2d

547 (1989); *State v. Spence*, 182 W.Va. 472, 481 n. 10, 388 S.E.2d 498, 507 n. 10 (1989).

In the instant case, the *Brady* issue, obviously, presents a constitutional issue. As a general matter, our cases have required that an alleged error be such that a trial court had an opportunity to rule upon the issue even if it failed to do so. Typically, as with the present case, an alleged *Brady* violation will not present a trial court with an opportunity to make a ruling initially during an actual trial because the violation involves undisclosed evidence. Further, in this case, the lower court was not presented with the *Brady* issue in post-trial motions. In the instant proceeding the alleged *Brady* violation is problematically compounded, in that it does not present even de minimis support in the record to justify a plain error analysis by this Court.

14. Where a *Brady* issue is presented to the Court as an assignment of error for the first time on direct appeal and this Court declines to hear the issue because the State objects and the record is inadequately developed, the defendant may seek review of the issue through a habeas corpus proceeding.

[rulings on alleged errors] and gives due regard not only to the factors that inform our opinion but also to its superior point of vantage.").

Applying the extremely narrow exception to the raise or waive rule announced in this opinion, we obtain the following results. In the instant proceeding, Mr. Salmons alleges not to have known of the existence of Mr. Huff's statement before or during the trial. However, at some point after the trial, but before the petition for appeal was filed, Mr. Salmons learned of Mr. Huff's statement.[15] Mr. Salmons alleges that Mr. Huff's statement is exculpatory evidence.[16] Mr. Salmons did not seek a new trial under Rule 33, and therefore, the trial court was not given an opportunity to rule on this matter. Moreover, the State made no objection to the issue being raised for the first time on appeal and has briefed and argued the issue. Additionally, the statement by Mr. Huff was placed under seal by the trial court as part of a "police grand jury report" and made part of the record. In view of these factors, this Court will exercise its discretion and determine whether, as alleged by Mr. Salmons, the failure to produce Mr. Huff's statement violated *Brady*, W. Va. R.Crim. P. Rule 26.2 and W. Va. R. Evid. Rule 612(b).

■■■ **1. The Brady Argument.** Mr. Salmons alleges that Mr. Huff's statement was exculpatory evidence which the State was required to turn over under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and this Court's decisions interpreting *Brady*. "In the context of criminal trials, it is without question that it is a constitutional violation of a defendant's right to a fair trial for a prosecutor to withhold or suppress exculpatory evidence." *Lawyer Disciplinary Bd. v. Hatcher*, 199 W.Va. 227, 232, 483 S.E.2d 810, 815 (1997).

■■■ In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process

where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196–97. Subsequently, in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Court held that the prosecution had a duty to disclose exculpatory evidence even though no requests were made for it. This Court has incorporated into West Virginia jurisprudence the principles set forth in *Brady* and *Agurs*. We held in syllabus point 4 of *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982), that "[a] prosecution that withholds evidence which if made available would tend to exculpate an accused by creating a reasonable doubt as to his guilt violates due process of law under Article III, Section 14 of the West Virginia Constitution." *See State v. Osakalumi*, 194 W.Va. 758, 763, 461 S.E.2d 504, 509 (1995); Syl. pt. 3, *State v. Thomas*, 187 W.Va. 686, 421 S.E.2d 227 (1992); Syl. pt. 2, *State v. Wheeler*, 187 W.Va. 379, 419 S.E.2d 447 (1992); *State v. Ward*, 188 W.Va. 380, 391, 424 S.E.2d 725, 736 (1991); Syl. pt. 1, *State v. James*, 186 W.Va. 173, 411 S.E.2d 692 (1991); Syl. pt. 4, *State v. Fortner*, 182 W.Va. 345, 387 S.E.2d 812 (1989); Syl. pt. 1, *State v. Hall*, 174 W.Va. 787, 329 S.E.2d 860 (1985). The decision in *Agurs* formulated the following test for determining the materiality of undisclosed evidence when a defense request for the specific evidence is not made:

It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

---

**15.** *See supra* note 13.

**16.** The record indicates that Mr. Salmons sought, during pretrial proceedings and at trial, a "police grand jury report" which actually contained Mr.

Huff's statement. The trial court placed the report under seal and made it part of the record. Its contents were not disclosed to Mr. Salmons.

*Agurs*, 427 U.S. at 112–13, 96 S.Ct. at 2402. *See Hatfield*, 169 W.Va. at 205, 286 S.E.2d at 411.

▮ In a third landmark case, *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the United States Supreme Court held that there was no difference between exculpatory and impeachment evidence for *Brady* purposes. The decision in *Bagley* held that exculpatory or favorable evidence is material to a defendant "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383. *See* Syl. pt. 6, *State v. Kerns*, 187 W.Va. 620, 420 S.E.2d 891 (1992); *Ward*, 188 W.Va. at 391, 424 S.E.2d at 736; *Fortner*, 182 W.Va. at 353, 387 S.E.2d at 820.

▮ In a recent decision, *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), several implications flowing from *Bagley* were expounded. First, *Kyles* held that under *Bagley* "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles*, 514 U.S. at 434, 115 S.Ct. at 1565. Under *Bagley* the issue becomes whether, in the absence of the evidence, the defendant received a fair trial. Thus, establishing reasonable probability under *Bagley* means showing that the government's nondisclosure undermines confidence in the outcome of the prosecution. *Id.* Second, *Kyles* indicated that the *Bagley* analysis is not a sufficiency of evidence test. Establishing a *Brady* violation does not require "demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435, 115 S.Ct. at 1566. Third, *Kyles* noted that "once a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless-error review." *Id. Kyles*' disapproval of the harmless error analysis once a *Brady* violation is determined was explicitly made in the context of habeas corpus review, not direct appeal. Fourth, *Kyles* held that under *Bagley* the government has some degree of discretion, but also a corresponding burden:

> On the one side, showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a *Brady* violation, without more. But the prosecution ... must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached. This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation, the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

*Id.* at 437–438, 115 S.Ct. at 1567–1568.

This Court has previously considered cases dealing with prosecutions that have withheld potentially exculpatory evidence. In *State v. Hatfield, supra*, the defendant was convicted of first degree murder. The defendant learned during his trial that the State knew the identity of the person who owned a gun that was found at the victim's residence. The owner of the gun was a witness for the defendant. This Court held in *Hatfield* that the identity of the owner of the gun was not exculpatory evidence. In *State v. Hall, supra*, the defendant also was convicted of first degree murder. After the conviction, the defendant learned that the State failed to produce a statement by the eyewitness to the crime. The statement contradicted the witness' trial testimony. This Court found that, based upon the crucial testimony of the witness, a *Brady* violation occurred, and a new trial was necessary.

In *State v. Fortner, supra*, the defendant was convicted of sexual offenses. On appeal, the defendant argued that the State failed to disclose a statement given to the police by the victim. The undisclosed statement revealed that one of the five men who had

taken part in the sexual offenses committed against the victim had taken a less active part in the crimes. The defendant did not become aware of the victim's statement until after his trial. It was undisputed by the State that it had the statement and failed to disclose the statement to the defendant prior to trial. We concluded in *Fortner* that the statement withheld by the prosecution did not contain clearly exculpatory evidence. We also decided that the evidence at trial demonstrated that the defendant could not have been the "fifth man" alluded to by the victim in her statement to the police. Accordingly, the statement could not have impacted on the defendant's guilt or innocence.

Similarly, in this Court's decision in *State v. Ward, supra,* we were again confronted with the issue of alleged exculpatory evidence not being turned over by the State. The defendant in that case was convicted of first degree murder. In *Ward,* the State failed to reveal the identity of a witness and a statement made by the witness to the police. The statement given by the witness identified another person at the crime scene. The defendant did not learn of the witness and statement until after his trial. This Court concluded that the nondisclosure to the defendant of the witness and statement, in the context of all other evidence in the case, did not violate the defendant's due process rights. We said that the potentially exculpatory evidence, particularly in light of other contradictory evidence, in no way contradicted the evidence used to convict the defendant at trial. Further, we found to be questionable whether the evidence would even establish that someone else not matching the defendant's description was present

at the crime scene near the time the crime was committed.[17]

In the instant proceeding, Mr. Salmons argues that Mr. Huff's statement contained exculpatory material which the State was constitutionally required to disclose.[18] Mr. Huff's statement indicates only that Mr. Myles voluntarily left the Tap Room with Mr. Salmons. Mr. Salmons' brief contends that Mr. Myles testified "that he did not voluntarily leave the bar and get into his car with Michael Salmons." Mr. Salmons further contends that "Huff's statement not only contradicted Myles' version of the facts, but directly negated an essential element of the crimes charged." Mr. Myles never testified that he was abducted from inside the bar. On the issue of leaving the bar, Mr. Myles testified as follows:

Q. So at that point in time, Blaine Salmons had left, Kim Porter had left and these other two individuals that you didn't know had left, is that correct?

A. Yes.

Q. The only individual of this group that was still in the bar was Michael Salmons?

A. That's correct.

Q. What happened next?

A. I walked out the door and started to get into my car and Michael Salmons said, "Hey, let's go play a game of pool," and I said, "No, I have something to do. I need to go and I've got a meal in the car and I'm going home."

\* \* \* \* \* \*

Q. When Michael asked you to play pool and you refused, what happened?

Soon there after they got up to leave [Mr. Salmons and Mr. Myles]. Philip said "Good [n]ite" and we gave each other a hug, and while doing so I quietly asked if he was taking them all home? He said "no just Mike." We laughed at that and again said "Good [n]ite" to each other and I said "Good [n]ite, [n]ice [m]eeting you to Mike." Philip had his car keys in his hand. When I left about 20 min[utes] later Philip['s] Black Camero was gone from where it was parked in lot not far from the door.

---

17. The *Brady* violations alleged in *Osakalumi* (new trial awarded) and *Thomas* (new trial awarded) involved a failure by the State to preserve evidence. The decision in *James* (affirmed conviction) involved the failure to disclose a plea agreement with a co-defendant. We did not resolve the *Brady* issue in *James* because of an insufficient record. We suggested the issue be brought in a habeas proceeding. The decision in *Wheeler* did not present a direct *Brady* violation. However, the opinion in that case noted that such a violation did not occur.

18. The text of Mr. Huff's statement is as follows:

A. He asked me again and I said no, I don't want to, and I started to put my keys in the car and he grabbed me by the shirt here and started wrestling me, then he started motioning like this in the alley.

Mr. Myles' testimony indicated clearly that upon leaving the bar, he voluntarily stood at his car and talked with Mr. Salmons. While outside the bar, during the course of a mutual conversation near Mr. Myles' car, the abduction occurred. No witness testified that Mr. Myles involuntarily left the bar.[19] Moreover, in this Court's review of the State's opening statement and closing argument we did not discern any language which suggested Mr. Myles was abducted from inside the Tap Room. Thus, Mr. Huff's statement was not exculpatory evidence, nor did it have any value as impeachment evidence. *James*, 186 W.Va. at 175, 411 S.E.2d at 694 ("[I]mpeachment evidence that might be used to show 'bias or interest' ... falls within the *Brady* rule."). In sum, Mr. Huff's statement was immaterial.[20] *See* Syl. pt. 1. *State v. Brewster*, 164 W.Va. 173, 261 S.E.2d 77 (1979) (" 'Before prosecutorial error can occur un-

der the doctrine of suppression of evidence, it must be shown that the evidence suppressed would be relevant to an issue at the criminal trial.' " (*quoting* Syl. pt. 4, *State v. Bolling*, 162 W.Va. 103, 246 S.E.2d 631 (1978))). Therefore, we conclude that no *Brady* violation occurred.

**█ 2. The Rule 26.2 Argument.** At trial, the State called as a witness Detective L. Pauley of the Charleston Police Department. Detective Pauley was the lead investigating officer in the case. He also testified before the grand jury. At the conclusion of direct·examination of Detective Pauley, Mr. Salmons moved the trial court, for purposes of cross examination, to require the State to turn over a "police grand jury report" compiled by Detective Pauley for the State's presentation to the grand jury.[21] The trial court denied the motion.

**█** Mr. Salmons argues on appeal that he was entitled, under W. Va. R.Crim. P. Rule 26.2, to have a copy of the "police grand jury report." [22] This argument is premised,

**19.** We are disturbed by the statements on this issue which appear in Mr. Salmons' petition for appeal and appeal brief. This Court fully understands and expects defense counsel to vigorously advocate for defendants on appeal. However, no reasonable interpretation of the trial testimony from any witness could lead to the conclusion that Mr. Myles was involuntarily removed from inside the Tap Room.

**20.** We further clarify and emphasize that nothing in Mr. Huff's statement raised questions about the credibility or veracity of Mr. Myles' account of the evenings events at the Tap Room. Specifically, Mr. Huff's statement suggests that Mr. Myles might have intended, when they left the bar, to give Mr. Salmons a ride or gone home with Mr. Salmons. Assuming arguendo, that this was true, nothing in such a scenario contradicts any testimony given by Mr. Myles about the circumstances of his leaving the bar. An extensive cross-examination of Mr. Myles did not elicit any testimony that would be in contradiction to any inferences drawn from Mr. Huff's statement. Therefore, Mr. Huff's statement could not be viewed as impeachable evidence regarding Mr. Myles' veracity or credibility.

**21.** Mr. Salmons had made a similar request during pretrial proceedings.

**22.** Rule 26.2 provides as follows:

(a) Motion for Production. After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the State or the defendant and the defendant's attorney, as the case may be, to produce for the examination and use of the moving party any statement of the witness that is in their possession and that relates to the subject matter concerning which the witness has testified.

(b) Production of Entire Statement. If the entire contents of the statement relate to the subject matter concerning which the witness has testified, the court shall order that the statement be delivered to the moving party.

(c) Production of Excised Statement. If the other party claims that the statement contains privileged information or matter that does not relate to the subject matter concerning which the witness has testified, the court shall order that it be delivered to the court in camera. Upon inspection, the court shall excise the portions of the statement that are privileged or that do not relate to the subject matter concerning which the witness has testified, and shall order that the statement, with such material excised, be delivered to the moving party. Any portion of the statement that is withheld from the defendant over his or her objection shall be preserved by the attorney for the state, and, if the defendant appeals a conviction, must be made available to the appellate court for the purpose of determining the correctness of the decision to excise the portion of the statement.

rather precariously, upon proving that had the "police grand jury report" been produced in its entirety, Mr. Salmons would have obtained the statement by Mr. Huff, which was contained in the "police grand jury report." The presentation of this issue is, therefore, an indirect route to Mr. Salmons' *Brady* claim. We have already determined that failure to turn over Mr. Huff's statement did not present a *Brady* violation. Nevertheless, because Mr. Salmons' argument attacks the "police grand jury report" in its entirety, we must address this issue. " 'Whether, in a particular case, the production of such a [report] will be ordered is a question for the trial court in its discretion to resolve.' " *State v. Kerns*, 187 W.Va. 620, 627, 420 S.E.2d 891, 898 (1992) (*quoting* Charles E. Torcia, Wharton's Criminal Procedure § 336, at 655 (13th ed.1990)). Therefore, this Court reviews a trial court's ruling on a Rule 26.2 motion for abuse of discretion. *See Kerns*, 187 W.Va. at 627, 420 S.E.2d at 898.

■ We note at the outset that Mr. Salmons has cited *State v. Miller*, 184 W.Va. 492, 401 S.E.2d 237 (1990) (per curiam), and *State v. Gale*, 177 W.Va. 337, 352 S.E.2d 87 (1986) (per curiam), for the proposition that a "police grand jury report" is a statement within the meaning of Rule 26.2. First, we have reminded the bar that per curiam opinions are not to be cited to this Court as authority. Second, neither of the cases cited support Mr. Salmons' argument. Rule 26.2 of the West Virginia Rules of Criminal Procedure imposes certain conditions for the disclosure of the prior statements of a witness, who is not the defendant, to the adverse party for *purposes of impeachment*.[23] There are four basic conditions that must be met to require disclosure under Rule 26.2. First, a witness' prior statement being sought for the purpose of impeaching the direct testimony of that witness must satisfy the definition of a witness' prior statement pursuant to Rule 26.2(f).[24] Second, the statement must be possessed by the proponent of the witness.[25] Third, the witness' prior statement must relate to the subject matter of the witness' testimony on direct examination.[26] Fourth, the prior statement need not be disclosed earlier than the conclusion of the witness' testimony on direct examination.[27] *See* 25

---

(d) Recess for Examination of Statement. Upon delivery of the statement to the moving party, the court, upon application of that party, may recess the proceedings so that counsel may examine the statement and prepare to use it in the proceedings.

(e) Sanction for Failure to Produce Statement. If the other party elects not to comply with an order to deliver a statement to the moving party, the court shall order that the testimony of the witness be stricken from the record and that the trial proceed, or, if it is the attorney for the state who elects not to comply, shall declare a mistrial if required by the interest of justice.

(f) Definition. As used in this rule, a statement of a witness means:

(1) A written statement made by the witness that is signed or otherwise adopted or approved by the witness;

(2) A substantially verbatim recital of an oral statement made by the witness that is recorded contemporaneously with the making of the oral statement and that is contained in a stenographic, mechanical, electrical or other recording or a transcription thereof or;

(3) A statement, however taken or recorded or a transcription thereof, made by the witness to a grand jury.

(g) Scope of Rule. This rule applies at a suppression hearing conducted under Rule 12, at trial under this rule, and to the extent specified:

(1) in Rule 32(d) at sentencing;

(2) in Rule 32.1(c) at a hearing to revoke or modify probation or supervised release; and

(3) in Rule 46(i) at a detention hearing.

**23.** *See United States v. Arboleda*, 929 F.2d 858, 862 (1st Cir.1991).

**24.** *See State v. Watson*, 173 W.Va. 553, 560, 318 S.E.2d 603, 610 (1984) ("[T]he court must ascertain if there exists a 'statement' within the meaning of the rule.").

**25.** *See* Syl. pt. 5, *Watson, id.* ("Under the 'in the possession of' language of Rule 26.2(f) of the West Virginia Rules of Criminal Procedure, a prosecutor is required to disclose statements to which he has access even though he does not have the present physical possession of the statements.").

**26.** *See United States v. Susskind*, 4 F.3d 1400, 1404 (6th Cir.1993) (discussed in context of Jencks Act).

**27.** *See Wheeler*, 187 W.Va. at 383, 419 S.E.2d at 451 ("[W]itness statements do not have to be provided under Rule 26.2 until after that witness testifies on direct examination."); *State v. James Edward S.*, 184 W.Va. 408, 411 n. 3, 400 S.E.2d 843, 846 n. 3 (1990) ("Under Rule 26.2 of the

Moore's Federal Practice § 626.2.04[2][a] (1998). Thus, the threshold inquiry for this Court is whether the "police grand jury report" constitutes a statement within the meaning of Rule 26.2. We now proceed to make such an inquiry.

 In syllabus point 1 of *State v. Wheeler,* 187 W.Va. 379, 419 S.E.2d 447 (1992), we determined Rule 26.2(a) provides that

> After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the State or the defendant and his attorney, as the case may be, to produce for the examination and use of the moving party any statement of the witness that is in their possession that relates to the subject matter concerning which the witness has testified.

*See* Syl. pt. 13, *State v. McFarland,* 175 W.Va. 205, 332 S.E.2d 217 (1985). The critical issue stemming from *Wheeler's* pronouncement involves the determination of what is meant by the term "statement." Rule 26.2(f) defines "statement" to mean (1) a written statement made by the witness that is signed or otherwise adopted or approved by the witness; (2) a substantially verbatim recital of an oral statement made by the witness that is recorded contempora-

neously with the making of the oral statement and that is contained in a stenographic, mechanical, electrical or other recording or a transcription thereof; or (3) a statement, however taken or recorded or a transcription thereof, made by the witness to a grand jury.[28]

"Our Rule 26.2 is patterned after Rule 26.2 of the Federal Rules of Criminal Procedure[.]"[29] *State v. Watson,* 173 W.Va. 553, 558, 318 S.E.2d 603, 608 (1984). *See Kerns,* 187 W.Va. at 627 n. 9, 420 S.E.2d at 898 n. 9; *State v. Miller,* 175 W.Va. 616, 626, 336 S.E.2d 910, 920 (1985). Federal courts interpreting Rule 26.2(f) of the federal rules of criminal procedure have clearly held that, as a general matter, "for production to be required, the materials should not only reflect the witness' own words, but should also be in the nature of a complete recital that eliminates the possibility of portions being selected out of context." *United States v. Bobadilla–Lopez,* 954 F.2d 519, 522 (9th Cir.1992). We observed in *McFarland,* 175 W.Va. at 221, 332 S.E.2d at 234, that "Rule 26.2(f)(1) defines 'statement,' inter alia, as '[a] written statement made by the witness that is signed or otherwise adopted or approved by him.'" (Citation omitted)

This Court noted in syllabus point 3 of *Watson* that "[t]he term 'statement' [as] de-

West Virginia Rules of Criminal Procedure, statements do not have to be made available until after the witness testifies on direct examination."); *State v. Lassiter,* 177 W.Va. 499, 507, 354 S.E.2d 595, 603 (1987) ("[W]itness' statements . . . are not discoverable until the witness has been called."); *State v. Miller,* 175 W.Va. 616, 626, 336 S.E.2d 910, 920 (1985) ("Rule 26.2 . . . creates no right to production of statements of witnesses until the witness has testified on direct examination."); *Watson,* 173 W.Va. at 560, 318 S.E.2d at 610 ("[T]he rule technically does not permit the motion or request to be made until the witness has testified.").

**28.** *See also* Syl. pt. 3, *State v. Sette,* 161 W.Va. 384, 242 S.E.2d 464 (1978) ("Unless there are compelling circumstances which dictate to the contrary, a criminal defendant, upon proper motion, is entitled, for the purpose of cross-examination, to have any written statements in the State's possession made by a prosecution witness who has testified against the defendant; furthermore, the defendant must be given a reasonable opportunity to study the statements and prepare cross-examination.").

**29.** We made the following observations in *Watson,* 173 W.Va. at 558, 318 S.E.2d at 608–609:

> The advisory committee's note to Federal Rule 26.2 reflects that the rule developed from two sources. . . . The first was the Jencks Act, 18 U.S.C. § 3500, which provided a rather detailed procedure requiring the government to produce written statements of witnesses who testified at trial. The defendant had to request production of the written statement once the witness completed his direct examination.
>
> The second source was the case of *United States v. Nobles,* 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975), where the United States Supreme Court recognized under certain circumstances that the prosecutor could compel the production of written statements of defense witnesses. Thus, as the commentators recognized, *Nobles* provided the reciprocity that the Jencks Act lacked and gave the impetus for the adoption of Rule 26.2.
>
> (Citations and footnote omitted.)

fined in Rule 26.2(f)[ (3) ] ... includes a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury." 173 W.Va. 553, 318 S.E.2d 603. Under *Watson* the State, in the instant proceeding, would have been obligated to produce the actual testimony given to the grand jury by Detective Pauley, but only insofar as that testimony actually related to his trial testimony on direct examination.[30] *See United States v. Medina*, 992 F.2d 573, 580 (6th Cir.1993); *United States v. Hill*, 976 F.2d 132, 140 (3rd Cir.1992); *United States v. Span*, 970 F.2d 573, 582 (9th Cir.1992). However, the request here is the "police grand jury report," not Detective Pauley's actual testimony before the grand jury. *See generally, Kerns* 187 W.Va. at 625–627, 420 S.E.2d at 896–898 (defendant sought production of actual statement made by testifying witness).

■ In the instant proceeding, Detective Pauley described the "police grand jury report" as a compilation of all the relevant evidence obtained by police officers during the investigation of this case, which would include documentary and physical evidence. The compilation of this evidence was for the sole purpose of providing it to the prosecutor to be presented by the prosecutor to the grand jury. Clearly, as the applicable law relied upon above indicates, the "police grand jury report" does not meet the threshold requirement of a "statement" under Rule 26.2(f).[31] *See* Syl. pt. 14, *McFarland*, 175 W.Va. 205, 332 S.E.2d 217 ("A witness' notes which are abstracts from reports in the possession of a defendant in a criminal case do not constitute a 'statement' as defined in W.Va.R.Crim.P. 26.2(f).").

Mr. Salmons invites this Court to adopt an interpretation of Rule 26.2 that would allow production of a "police grand jury report" anytime a law enforcement officer responsible for compiling such a report testifies at trial. We refuse to follow this path to its logical chaotic conclusion. Rule 26.2 was not intended to be a clearing house for obtaining documents. The intent of Rule 26.2 is to permit a party to obtain actual statements made by a witness for the purpose of impeaching the testimony of that witness. Therefore, we hold that the "police grand jury report" is not, in and of itself, a statement within the meaning of Rule 26.2(f). Thus, the trial court did not abuse its discretion in denying production of the "police grand jury report" under Rule 26.2.

■ **3. The Rule 612(b) Argument.** Mr. Salmons further contends on appeal that he was entitled to the "police grand jury report" under W. Va. R. Evid. Rule 612(b) because Detective Pauley testified that he reviewed the "police grand jury report" prior to his testimony. Mr. Salmons seeks to establish that, had the "police grand jury report" been turned over in its entirety, Mr. Salmons would have obtained Mr. Huff's statement. Having resolved the *Brady* issue, we nevertheless are obligated to address this issue because this argument, like the Rule 26.2 argument, is a direct attack upon the "police grand jury report" as a whole. We review the trial court's Rule 612 ruling for an abuse of discretion. *See State v. Farmer*, 200 W.Va. 507, 512, 490 S.E.2d 326, 331 (1997); Syl. pt. 1, *McDougal v. McCam-*

**30.** This Court indicated in syllabus point 4 of *Watson* that "[e]ven though the grand jury proceedings which involve a witness' statement have not been typed, this does not exempt the statement from the requirements of Rule 26.2[.]"

**31.** It should be pointed out that a supplemental report written by Detective Pauley was also part of the "police grand jury report." Detective Pauley's supplemental report was provided to Mr. Salmons prior to the detective's actual trial testimony. We have indicated elsewhere in this opinion that Rule 26.2 does not require production of a witness' statement until completion of direct testimony. Our analysis and perhaps ultimate conclusion regarding the "police grand jury report" may have been different had the supplemental report, which was part of the "police grand jury report," not been provided to Mr. Salmons. The supplemental report has the indicia of a final or formal police report. A final or formal police report of an investigation that was written by the State's witness is a statement within the meaning of Rule 26.2(f) and may be required to be produced provided the other requirements of Rule 26.2 are satisfied. *See* 25 Moore's Federal Practice § 626.2.04[2][c] (1998). *See also State v. Dudick*, 158 W.Va. 629, 632, 213 S.E.2d 458, 461 (1975) ("[T]he trial court's refusal to permit defense counsel to inspect the police report was reversible error.").

*mon,* 193 W.Va. 229, 455 S.E.2d 788 (1995); Syl. pt. 10, *Board of Ed. of McDowell County v. Zando, Martin & Milstead, Inc.,* 182 W.Va. 597, 390 S.E.2d 796 (1990).

 Rule 612 enumerates the conditions under which a writing or object used to refresh a witness' memory, either (1) while testifying or (2) before testifying, may be made available to the adverse party.[32] If the writing or object is used while a witness is testifying, it is mandatory that it be produced.[33] However, if the writing or object is used by the witness before testifying, the determination as to whether the writing or object is to be produced is discretionary with the trial court. *See United States v. Nobles,* 422 U.S. 225, 232 n. 6, 95 S.Ct. 2160, 2167 n. 6, 45 L.Ed.2d 141 (1975).[34] In *United States v. Sheffield,* 55 F.3d 341, 343 (8th Cir.1995), it was held that "Rule 612 is not a vehicle for a plenary search for contradictory or rebutting evidence that may be in a file but rather is a means to reawaken recollection of the witness to the witness' past perception about a writing." Rule 612 is a rule of evidence. Rule 612 is not a rule of discovery. Its sole purpose is evidentiary insofar as it seeks to promote the search for credibility and memory. *See Sporck v. Peil,* 759 F.2d 312, 317 (3d Cir.1985). For the purposes of Rule 612, "writing" or "object" includes songs, photographs, sound recordings, and even scents or allusions. It does not matter that the writing or object is an original or a copy. *See United States v. Rappy,* 157 F.2d 964 (2d Cir.1946); Franklin D. Cleckley, 1 Handbook on Evidence § 6–12(C)(4) (1994). "When a writing is used to refresh a witness' memory the writing itself is not the primary evidence. Rather, the oral testimony of the witness whose memory has been refreshed constitutes the evidence." Moore, Vestal & Kurland, 1 Moore's Manual: Federal Practice and Procedure, ch. 4, § 4.06 (1998).

 Under Rule 612(b) if a witness, before testifying, uses a writing or object to refresh his/her memory for the purpose of testifying, then, if the trial court finds that the interests of justice so require, an adverse party is entitled to have the writing or object, if practicable, at the trial. Mr. Salmons contends that under the language of Rule 612(b), the "police grand jury report" should have been produced. The State disagrees for a fundamental reason. The State correctly notes that an exception to Rule 612(b) is contained in Rule 612(c), and that the exception is applicable to this case. Rule 612(c) provides, in relevant part, that "[i]f it is claimed that the writing or object contains

---

**32.** Rule 612 provides:

(a) While Testifying. If, while testifying, a witness uses a writing or object to refresh memory, an adverse party is entitled to have the writing or object produced at the trial, hearing, or deposition in which the witness is testifying.

(b) Before Testifying. If, before testifying, a witness uses a writing or object to refresh memory for the purpose of testifying and the court in its discretion determines that the interests of justice so require, an adverse party is entitled to have the writing or object produced, if practicable, at the trial, hearing, or deposition in which the witness is testifying.

(c) Terms and Conditions of Production and Use. A party entitled to have a writing or object produced under this rule is entitled to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness. If production of the writing or object at the trial, hearing, or deposition is impracticable, the court may order it made available for inspection. If it is claimed that the writing or object contains matters not related to the subject matter of the testimony, the court shall examine the writing or object in camera, excise any portions not so related, and order delivery of the remainder to the party entitled thereto. Any portion withheld over objections shall be preserved and made available to the appellate court in the event of an appeal. If a writing or object is not produced, made available for inspection, or delivered pursuant to order under this rule, the court shall make any order justice requires, except that in criminal cases when the prosecution elects not to comply, the order shall be one striking the testimony or, if the court in its discretion determines that the interests of justice so require, declaring a mistrial.

**33.** *See State v. Dudick,* 158 W.Va. 629, 638–639, 213 S.E.2d 458, 464 (1975) ("[O]nce a prosecution witness has testified from notes used to refresh his recollection, the defense is absolutely entitled to look at the notes from which he testified and must be given a reasonable opportunity to study the material and to prepare cross-examination.").

**34.** Our Rule 612 is patterned after Fed.R.Evid. Rule 612.

matters not related to the subject matter of the testimony, the court shall examine the writing or object in camera, excise any portions not so related, and order delivery of the remainder to the party entitled thereto." We agree with the State's fundamental observation. Rule 612(c) disposes of this issue.

In denying Mr. Salmon's request for the "police grand jury report" in full, the trial court indicated on the record that it conducted an in camera review of the report and was making the report part of the record for appeal purposes. The trial court also indicated the following:

> The report is under seal. The report and everything in it is under seal. As to the substance of the information in the report, you [defendant Salmons] have it all. I reviewed that. I listened to the testimony of the witness. There's not anything in there that has come into this trial that has not been produced. That's all I can say.

The trial court concluded that the testimony of Detective Pauley did not relate to any of the documents in the "police grand jury report" that had not already been turned over to Mr. Salmons. Mr. Salmons' argument in this appeal is that, as a result of Detective Pauley's testimony, he was entitled to Mr. Huff's statement. We have examined Detective Pauley's testimony and conclude, as did the trial court, that Detective Pauley's testimony did not relate to Mr. Huff's statement. Thus, we find no abuse of discretion in the trial court's denial of Mr. Salmons' request for the "police grand jury report" under Rule 612(b).

### B. Striking Two Jurors For Cause

 The trial court struck two jurors who indicated a bias toward homosexuals.[35] Mr. Salmons contends that the trial court struck the two jurors because of their religion. This Court reviews a trial judge's decision to strike a juror for cause under an abuse of discretion standard. *See State v. Wade,* 200 W.Va. 637, 490 S.E.2d 724 (1997). We held in syllabus point 6 of *State v. Miller,* 197 W.Va. 588, 476 S.E.2d 535 (1996), in part,

that "[a]n appellate court ... should interfere with a trial court's discretionary ruling on a juror's qualification to serve because of bias only when it is left with a clear and definite impression that a prospective juror would be unable faithfully and impartially to apply the law." Notwithstanding the deference generally accorded in this area, this Court "give[s] strict scrutiny to cases involving the alleged wrongful injection of race, gender, or religion in criminal cases." *State v. Guthrie,* 194 W.Va. 657, 681, 461 S.E.2d 163, 187 (1995).

It was noted in *State v. Charlot,* 157 W.Va. 994, 1000, 206 S.E.2d 908, 912 (1974), that "[t]he true test to be applied with regard to qualifications of a juror is whether a juror can, without bias or prejudice, return a verdict based on the evidence and the court's instructions and disregard any prior opinions he may have had." *See* Syl. pt. 1, *Wheeler v. Murphy,* 192 W.Va. 325, 452 S.E.2d 416 (1994); Syl. pt. 1, *State v. Harshbarger,* 170 W.Va. 401, 294 S.E.2d 254 (1982). This Court held in syllabus point 5 of *Miller,* 197 W.Va. 588, 476 S.E.2d 535, that "[a]ctual bias can be shown either by a juror's own admission of bias or by proof of specific facts which show the juror has such prejudice or connection with the parties at trial that bias is presumed." Moreover, the opinion in *Miller* held in syllabus point 4, *id.,* that:

> The relevant test for determining whether a juror is biased is whether the juror had such a fixed opinion that he or she could not judge impartially the guilt of the defendant. Even though a juror swears that he or she could set aside any opinion he or she might hold and decide the case on the evidence, a juror's protestation of impartiality should not be credited if the other facts in the record indicate to the contrary.

During jury selection in the instant proceeding, the trial court informed the jury panel that evidence might be presented in the case concerning homosexuality. Two ju-

---

35. The victim in this case, Mr. Myles, is a homosexual. During cross examination of Mr. Myles, defense counsel asked Mr. Myles if he was a homosexual. Mr. Myles acknowledged that he was a homosexual.

rors indicated they held prejudices towards homosexuals. Both witnesses made remarks indicating that their bias toward homosexuals was a product of their religion. The trial court struck both jurors for cause. Mr. Salmons argues that the jurors were struck because of their Christian faith. The State disagrees. So do we. The record is quite clear. The trial judge went to great lengths to place on the record that the two jurors were not being struck because of their religion. The jurors were struck because they admitted they held prejudices against homosexuals. The trial court was not convinced by statements from both jurors that they would be able to put aside their biases towards homosexuals.

This Court ruled in *Miller* that ultimately "a trial judge is entitled to rely upon [his/her] self-evaluation of allegedly biased jurors [when] determining actual juror bias." 197 W.Va. at 605, 476 S.E.2d at 553. The trial judge is in the best position to determine the sincerity of a juror's pledge to abide by the court's instructions. Therefore, his/her assessment is entitled to great deference. *Miller*, 197 W.Va. at 605–606, 476 S.E.2d at 553–554. In *Miller*, the trial court did not strike two jurors for cause who expressed prejudices towards homosexuals. This Court did not reverse the trial court's decision in *Miller* on the issue of prejudices towards homosexuals. However, Justice Cleckley made quite clear that "this Court [was] greatly troubled by the fact that jurors who indicated negative personal opinions about the defendant's sexual orientation were permitted to serve over a challenge for cause. Indeed, we have ruled the injection of these types of issues into a trial would warrant reversal of the conviction on those grounds alone." *Miller*, 197 W.Va. at 606, 476 S.E.2d at 553. In the instant proceeding, the trial judge observed the demeanor and listened to the tone of voice of the two jurors, matters not reproducible in a record. The trial judge determined that the two jurors would not put aside their acknowledged biases towards homosexuals. Therefore, we discern no abuse of discretion.

## C. Failure To Advise Defendant Of His Right To Testify

At the close of the State's case-in-chief, Mr. Salmons indicated that he was not presenting evidence. The trial court made no inquiry as to whether Mr. Salmons knew he had a right to testify, nor did the trial judge inquire as to whether Mr. Salmons made a knowing, voluntary, and intelligent waiver of his right to testify. Mr. Salmons argues in this appeal that it was reversible error for the trial court to fail to make such inquiries. "A criminal defendant's right to give testimony on his own behalf is protected under article three, section ten of our Constitution, as well as the due process provisions of the federal constitution." Syl. pt. 4, *State v. Neuman*, 179 W.Va. 580, 371 S.E.2d 77 (1988). In syllabus point 5 of *Neuman, id.,* we held that "[c]ertain constitutional rights are so inherently personal and so tied to fundamental concepts of justice that their surrender by anyone other than the accused acting voluntarily, knowingly, and intelligently would call into question the fairness of a criminal trial." The decision in *Neuman* established a prophylactic rule to protect a defendant's constitutional right to testify. In syllabus point 7 of *Neuman, id.,* the Court stated:

> A trial court exercising appropriate judicial concern for the constitutional right to testify should seek to assure that a defendant's waiver is voluntary, knowing, and intelligent by advising the defendant outside the presence of the jury that he has a right to testify, that if he wants to testify then no one can prevent him from doing so, that if he testifies the prosecution will be allowed to cross-examine him. In connection with the privilege against self-incrimination, the defendant should also be advised that he has a right not to testify and that if he does not testify then the jury can be instructed about that right.

*See State v. Blake*, 197 W.Va. 700, 478 S.E.2d 550 (1996); *State v. Robinson*, 180 W.Va. 400, 376 S.E.2d 606 (1988).

Mr. Salmons contends, and the State concedes, that *Neuman* was violated by the trial court's failure to inquire into his decision not

to testify.[36] In syllabus point 2 of *State ex rel May v. Boles,* 149 W.Va. 155, 139 S.E.2d 177 (1964), we observed that "[c]ourts indulge every reasonable presumption against waiver of a fundamental constitutional right and will not presume acquiescence in the loss of such fundamental right." The State invites this Court to overrule *Neuman* as an unworkable procedural device.[37] Alternatively, the State argues that a *Neuman* violation is subject to a harmless error analysis. We are not prepared to overrule *Neuman.* However, we believe the State is correct in its urging that a *Neuman* violation should be subjected to a harmless error analysis.[38]

■ Justice Cleckley observed in *State v. Blake,* 197 W.Va. 700, 712, 478 S.E.2d 550, 562 (1996), "that the rule in *Neuman* was merely a procedural/prophylactic rule[.]" *Blake* articulated that "*Neuman* clarified applicable procedural law only, and not substantive or constitutional law[.]" *Id.* 197 W.Va. at 713, 478 S.E.2d at 563. In *State v. Blair,* 158 W.Va. 647, 659, 214 S.E.2d 330, 337 (1975), we noted that "[t]he doctrine of harmless error is firmly established by statute, court rule and decisions as a salutary aspect of the criminal law of this State. In a constitutional context, the doctrine is also applied because appellate courts are not bound to reverse for a technical violation of a

fundamental right." (Citations omitted.) The decision in *Blair* further held in syllabus point 5 that "[f]ailure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt." *Id.* It defies logic for this Court to hold that a harmless error analysis applies to substantive constitutional violations, yet hold that a harmless error analysis does not apply to a prophylactic rule designed to protect enforcement of a constitutional right. In fact, "[o]ur cases consistently have held that nonconstitutional errors are harmless unless the reviewing court has grave doubt as to whether the [error] substantially swayed the verdict." *State v. Potter,* 197 W.Va. 734, 748, 478 S.E.2d 742, 756 (1996). *See State v. Rahman,* 199 W.Va. 144, 483 S.E.2d 273 (1996); *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995); *State v. Young,* 185 W.Va. 327, 406 S.E.2d 758 (1991); *State v. Ferrell,* 184 W.Va. 123, 399 S.E.2d 834 (1990). Therefore, we hold that a violation of *Neuman* is subject to a harmless error analysis.

■ In devising a test for harmless error analysis of a *Neuman* violation we must be mindful of the rationale in *Neuman.* That is, *Neuman* seeks to assure that a defendant is aware of his or her right to testify and that there has been no coercion or

---

**36.** Only a minority of courts require a *Neuman*-type colloquy. *See Tachibana v. State,* 79 Hawai'i 226, 900 P.2d 1293 (1995); *State v. Ray,* 310 S.C. 431, 427 S.E.2d 171 (1993); *Sanchez v. State,* 841 P.2d 85 (Wyo.1992); *LaVigne v. State,* 812 P.2d 217 (Alaska 1991); *People v. Curtis,* 681 P.2d 504 (Colo.1984); *Culberson v. State,* 412 So.2d 1184 (Miss.1982).

**37.** A majority of courts have expressly rejected imposing a *Neuman*-type colloquy for trial courts. *See Brown v. Artuz,* 124 F.3d 73 (2d Cir.1997); *United States v. Ortiz,* 82 F.3d 1066 (D.C.Cir.1996); *Underwood v. Clark,* 939 F.2d 473 (7th Cir.1991); *United States v. McMeans,* 927 F.2d 162 (4th Cir.1991); *United States v. Martinez,* 883 F.2d 750 (9th Cir.1989), *vacated on other grounds,* 928 F.2d 1470 (9th Cir.), *cert. denied,* 501 U.S. 1249, 111 S.Ct. 2886, 115 L.Ed.2d 1052 (1991); *Siciliano v. Vose,* 834 F.2d 29 (1st Cir.1987); *United States v. Janoe,* 720 F.2d 1156 (10th Cir.1983); *State v. Walen,* 563 N.W.2d 742 (Minn.1997); *People v. Roman,* 172 Misc.2d 339, 658 N.Y.S.2d 196 (1997); *State v.*

*Thomas,* 128 Wash.2d 553, 910 P.2d 475 (1996); *State v. Oliver,* 101 Ohio App.3d 587, 656 N.E.2d 348, *cert. denied,* 73 Ohio St.3d 1409, 651 N.E.2d 1308 (1995); *State v. Brooks,* 833 P.2d 362 (Utah Ct.App.1992); *State v. Hamm,* 250 Mont. 123, 818 P.2d 830 (1991); *State v. Savage,* 120 N.J. 594, 577 A.2d 455 (1990); *Phillips v. State,* 105 Nev. 631, 782 P.2d 381 (1989); *Aragon v. State,* 114 Idaho 758, 760 P.2d 1174 (1988); *Torres-Arboledo v. State,* 524 So.2d 403 (Fla.1988); *Commonwealth v. Hennessey,* 23 Mass.App. 384, 502 N.E.2d 943, *review denied,* 399 Mass. 1102, 504 N.E.2d 1066 (1987); *People v. Simmons,* 140 Mich.App. 681, 364 N.W.2d 783 (1985); *State v. Hayes,* 314 N.C. 460, 334 S.E.2d 741 (1985); *State v. Allie,* 147 Ariz. 320, 710 P.2d 430 (1985); *People v. Longwith,* 125 Cal.App.3d 400, 178 Cal. Rptr. 136 (1981); *State v. Albright,* 96 Wis.2d 122, 291 N.W.2d 487 (1980).

**38.** Harmless error analysis was adopted for a *Neuman*-type violation in *LaVigne v. State,* 812 P.2d 217 (Alaska 1991).

trickery in a defendant's decision to relinquish the constitutional right to testify. In a real sense, the issue of evidentiary innocence or guilt is not a direct concern in *Neuman.* Thus, we hold that a rebuttable presumption exists that a defendant represented by legal counsel has been informed of the constitutional right to testify. When a defendant is represented by legal counsel, a *Neuman* violation is harmless error in the absence of evidence that a defendant's legal counsel failed to inform him/her of the right to testify, or that the defendant was coerced or misled into relinquishing the right to testify. When a defendant represents him/herself at trial, a *Neuman* violation is harmless error where it is shown that the defendant was in fact aware of his/her right to testify and that the defendant was not coerced or misled into relinquishing the right to testify. Applying this test to the instant case, we find that Mr. Salmons was in fact represented by legal counsel. There is nothing in the record to rebut the presumption that legal counsel failed to inform Mr. Salmons of the right to testify. The record fails to disclose any facts showing or suggesting that Mr. Salmons was coerced or misled into giving up the right to testify. In view of the test applied in this case, we find that the *Neuman* violation was harmless error.

### III.

### CONCLUSION

In view of the foregoing, we find no error in the conviction and sentence in this case. Therefore, the decision of the Circuit Court of Kanawha County is affirmed.

Affirmed.